ACCEPTED
03-13-00804-CR
3822347
THIRD COURT OF APPEALS
AUSTIN, TEXAS
1/20/2015 10:43:03 AM
JEFFREY D. KYLE
CLERK

No. **03-13-0804 - CR**

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
1/20/2015 10:43:03 AM
JEFFREY D. KYLE
Clerk

IN THE THIRD DISTRICT COURT OF APPEALS
AT AUSTIN, TEXAS

=============================================

# KAITLYN RITCHERSON

Appellant

v.

# THE STATE OF TEXAS,

Appellee

=================================================

Appeal from Convictions in Cause Numbers D-1-DC -302663
in the 331ST  District Court of Travis County, Texas,
Hon. Robert Perkins, Visiting Judge Presiding

=================================================

BRIEF FOR APPELLANT
=================================================

Respectfully submitted,

Law Office of Alexander L. Calhoun
State Bar No.: 00787187
4301 W. William Cannon Dr., Ste. B-150, # 260
Austin, TX 78749
Tele: 512/ 420 - 8850
Fax: 512/ 233- 5946
Cell: 512/731-3159
Email: alcalhoun@earthlink.net

Oral Argument is Requested

# STATEMENT OF ORAL ARGUMENT

Counsel believes oral argument would be beneficial to address or clarify  the issues raised in this case.

# TABLE OF CONTENTS

STATEMENT OF ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I

CERTIFICATE OF PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INDEX OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUE PRESENTED.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

POINT OF ERROR NUMBER ONE. . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

POINT OF ERROR NUMBER TWO.. . . . . . . . . . . . . . . . . . . . . . . . . . . 26

POINT OF ERROR NUMBER THREE.. . . . . . . . . . . . . . . . . . . . . . . . . 37

POINT OF ERROR NUMBER FOUR.. . . . . . . . . . . . . . . . . . . . . . . . . . 47

CONCLUSION AND PRAYER.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . 54

# CERTIFICATE OF PARTIES

Pursuant to Rule 38.1(a), Tex.R.App. Pro., Appellant presents the following persons who are parties to, or have an interest in the final judgment in this cause, so that the Court may determine whether its members are disqualified or should recuse themselves:

| | |
|---|---|
| Ms. Kaitlyn Ritcherson, TDCJ # 01905531 | Texas Department of Criminal Justice - Mountain View Unit |
| Mr. Alexander L. Calhoun, Appellate Atty | 4301 W. William Cannon Dr., Ste. B-150, # 260, Austin, TX 78749 |
| Mr. Charles F. Baird, Trial Attorney | 2312 Western Trails Blvd., Austin, TX 78745 |
| Ms. Amber Farrelly, Asst. Trial Atty | 2312 Western Trails Blvd., Austin, TX 78745 |
| Ms. Rosemary Lehmberg, Dist. Atty | Blackwell-Thurman Criminal Justice Complex, 509 W. 11th St, Austin, TX 78701 |
| Mr. Gary Cobb, & Ms. Meg McGee, Asst. Dist. Attys | Blackwell-Thurman Criminal Justice Complex, 509 W. 11th St, Austin, TX 78701 |
| Judge Robert Perkins, Visiting Judge | 1104 Nueces, # 203, Austin TX 78701 |

# INDEX OF AUTHORITIES

Cases:

*Almanza v. State*,  686 S.W.2d 157 (Tex.Cr.App. 1984). . . . . . . . . . . . . . . . . . . 23

*Apolinar v. State*,   155 S.W.3d 184 (Tex.Cr.App. 2005).. . . . . . . . . . . . . 31, 49, 50

*Arline v. State*, 721 S.W.2d 348 (Tex.Cr.App. 1986).. . . . . . . . . . . . . . . . . . . . . 23

*Bagheri v. State*, 119 S.W.3d 755 (Tex.Cr.App. 2003). . . . . . . . . . . . . . . . . . . . 34

*Banda v. State*, 890 S.W.2d 42 (Tex. Cr.App. 1994). . . . . . . . . . . . . . . . . . . . . . 17

*Barley v. State*,  01-12-01002-CR
        (Tex.App.- Houston [1st Dist.] 10-29-2013) (not published). . . . . . . . . . 35

*Barshaw v.  State*,  342 S.W.3d 91  (Tex.Cr.App. 2011). . . . . . . . . . . . . . 34, 44, 52

*Bell v. State*, 693 S.W.2d 434  (Tex.Cr.App.1985).. . . . . . . . . . . . . . . . . . . . . . . 17

*Bignall v. State*, 887 S.W.2d 21 (Tex.Cr.App. 1994). . . . . . . . . . . . . . . . . . . 17, 20

*Britain v. State*,  412 S.W.3d 518 (Tex.Cr.App. 2013) . . . . . . . . . . . . . . . . . . . . 17

*Brown v. State*, 296 S.W.3d 371 (Tex. App.- Beaumont 2009). . . . . . . . . . . . . . . 18

*Bounderant v. State*, 956 S.W.2d 762 (Tex.App. – Fort Worth 1997). . . . . . . . . . 50

*Cavazos v. State*, 382 S.W.3d 377  (Tex.Cr.App.2012). . . . . . . . . . . . . 17, 18, 19, 22

*Chavarriga v. State,*  156 S.W.3d 642  (Tex.App. - Tyler 2004). . . . . . . . . . . . . . 18

*Crawford v. Washington*,  541 U.S. 36 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Darby v. State*, 145 S.W.3d 714 (Tex. App. -Fort Worth 2004). . . . . . . . . . . . . . 35

*Edmondson v. State*, 399 S.W.3d 607 (Tex.App. - Eastland 2013). . . . . . . . . . . . 31

*Englund v. State*, 946 S.W.2d 64  (Tex.Cr.App. 1997). . . . . . . . . . . . . . . . . . . 42

*Erazo v. State*, 144 S.W.3d 487 (Tex. Cr. App. 2004). . . . . . . . . . . . . . . . . . . 39

*Flores v. State*, 245 S.W.3d 432 (Tex.Cr.App. 2008).. . . . . . . . . . . . . . . . . . . 17

*Garcia v. State*, 126 S.W.3d 921 (Tex.Cr. App. 2004).. . . . . . . . . . . . . . 34, 44, 51

*Glover v. State*, 102 S.W.3d 754  (Tex.App. - Texarkana 2002). . . . . . . . . . . 50, 51

*Hernandez v. State*, 819 S.W.2d 806 (Tex.Cr.App. 1991). . . . . . . . . . . . . . . . . 35

*Hughes v. State*, 128 S.W.3d 247  (Tex.App.  – Tyler 2003). . . . . . . . . . . . . . . . 50

*Hooper v. State*, 214 S.W.3d 9 (Tex.Cr.App. 2007). . . . . . . . . . . . . . . . . . . . . 20

*Hughes v. State*, 128 S.W.3d 247  (Tex.App.  – Tyler 2003). . . . . . . . . . . . . . . . 50

*Hunt v. State*, 904 S.W.2d 813  (Tex.App. - Fort Worth 1995). . . . . . . . . . . . . 31

*Jessop v. State*,  368 S.W.3d 653 (Tex.App.-Austin 2012). . . . . . . . . . . . . . 38, 39

*Jurek v. Couch-Jurek,*  296 S.W.3d 864 (Tex.App. - El Paso 2009). . . . . . . . . . 42

*King v. State*,  953 S.W.2d 266 (Tex.Cr.App.  1997). . . . . . . . . . . . . . . . . . 33, 44

*Lagunas v. State*,  187 S.W.3d 503 (Tex.App. - Austin   2005). . . . . . . . . . . . . . 50

*Martinez v. State*, 178 S.W.3d 806 (Tex. Cr. App. 2005).. . . . . . . . . . . . . . . . . 50

*McCarty v. State*,   257 S.W.3d 238 (Tex.Cr.App. 2008).. . . . . . . . . . . . . . . 31, 32

*McMahon v. State*, 582 S.W.2d 786 (Tex.Cr.App. 1978).. . . . . . . . . . . . . . . . . 41

*Miranda v. Arizona*, 384 U.S. 436 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Montgomery v. State*, 810 S.W.2d 372 (Tex.Cr.App. 1991).. . . . . . . . . . . . . 28, 39

*Montgomery v. State*, 198 S.W.3d 67 (Tex.App. - Ft. Worth 2006).. . . . . . . . . . 23

*Moreno v. State*, 22 S.W.3d 482 (Tex.Cr.App. 1999). . . . . . . . . . . . . . . . . . . . . . 28

*Motilla v. State*, 78 S.W.3d 352 (Tex.Cr.App. 2002). . . . . . . . . . . . . . . . . 34, 44, 51

*Otting v. State*, 8 S.W.3d 681 (Tex.App. - Austin 1999). . . . . . . . . . . . . . 23, 24, 25

*Pawlak v. State*, 420 S.W.3d 807 (Tex.Cr.App. 2013). . . . . . . . . . . . . . . . . . . . . . 38

*People v. Allen*, 158 Mich. App. 472, 404 N.W.2d 266 (1987). . . . . . . . . . . 41, 42

*People v. Vanhoesen*, 3 A.D.3d 787,
    771 N.Y.S.2d 730 (N.Y. 3d Dept. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*People v. Watts*, 165 P.3d 707 (Colo.App. 2006). . . . . . . . . . . . . . . . . . . . . . . . 41

*Perez v. State*, 113 S.W.3d 819 (Tex.App. - Austin 2003). . . . . . . . . . . . . . . . . . 51

*Reese v. State*, 33 S.W.3d 238 (Tex.Cr.App. 2000). . . . . . . . . . . . . . . . . . . . . . . 39

*Salazar v. State*, 38 S.W.3d 141 (Tex.Cr. App. 2001). . . . . . . . . . . . . . . . . . . . . 50

*Sandoval v. State*, 409 S.W.3d 259 (Tex.App. - Austin 2013). . . . . . . . . . . . 28, 31

*Sanders v. State*, 422 S.W.3d 809 (Tex.App.-Ft. Worth 2014). . . . . . . . . . . . . . 39

*Saunders v. State*, 913 S.W.2d 564 (Tex.Cr.App. 1995). . . . . . . . . . . . . . . . . . . 23

*Schroeder v. State*, 123 S.W.3d 398 (Tex.Cr.App.2003). . . . . . . . . . . . . . . . . . . 17

*Soto v. State*, 13-10-013-CR (Tex.App. - Corpus Christi 10-20-2011). . . . . . . . 35

*State v. Bauerly*, 520 N.W.2d 760 (Minn.App. 1994). . . . . . . . . . . . . . . . . . . . . 41

*State v. Constantine*, 588 A.2d 294 (Me. 1991). . . . . . . . . . . . . . . . . . . . . . . . . 41

*Tollett v. City of Kemah*, 285 F.3d 357 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . 28

*Thomas v. State*, 699 S.W.2d 845 (Tex.Cr.App. 1985). . . . . . . . . . . . . . . . . . . . 18

*Turpin v. Kassulke*,  26 F.3d 1392 (6th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Clymore*, 245 F.3d 1195 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . 28

*United States v. Treff*,  924 F.2d 975 (10th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . 30

*Walker v. Lockhart*,  763 F.2d 942 (8th Cir. 1985).. . . . . . . . . . . . . . . . . . . . . . . . 30

*Volkswagen of America, Inc. v. Ramirez*, 159 S.W.3d 897 (Tex. 2005). . . . . . . . 49

*Zuliani v. State*, 97 S.W.3d 589 (Tex. Cr. App. 2003). . . . . . . . . . . . . . . . 31, 32, 49

Statutes and Rules

Tex.Code Crim.Pro. Art. 37.09. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

Tex.Code Crim.Pro. Art. 38.22. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Tex. Penal Code § 19.02 (b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 14, 16, 17

Tex. Penal Code § 19.02 (b)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 14, 16, 17

Tex.R.App.Pro. Rule 44.2(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 44

Tex.R.Evid. Rue 403. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 38, 44

Tex.R.Evid. Rule 613(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Tex.R.Evid Rule 801(a).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Tex.R.Evid. Rule 803(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 29, 49

Miscellaneous Authorities

Annot., Admissibility of Evidence Concerning Words
Spoken While Declarant Was Asleep or
Unconscious, 14 A.L.R.4th 802  (1982 & Supp. 1989). . . . . . . . . . . . . . . . . . . . . 30

<u>Texas Rules of Evidence Handbook</u>, 988 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . 42

6 Wigmore, Evidence in Trials at Common Law
§ 1747 (James H. Chadbourn rev. 1976). . . . . . . . . . . . . . . . . . . . . . . . . 50

**TO THE HONORABLE JUDGES OF THE COURT OF APPEALS**:

COMES NOW, before the Court, Appellant, by and through his attorney of record, and pursuant to Rule 38.1, Tex.R.App.Pro., files this brief on appeal, and would show the Court as follows:

## STATEMENT OF THE CASE

Appellant was charged by indictment with murder, in violation of Tex. Penal Code § 19.02 (b)(1) & (2). [Clerk's Record ("C.R."): 20 - 21]. Her first trial ended in a mistrial at the guilt-innocence phase afer the jury deadlocked. [19 Reporter's Record ("R.R."): 5]. On re-trial, the jury convicted her of the offense as charged in the indictment. [C.R.: 295, 306, 307 - 308]. Following the punishment phase, the jury assessed a sentence of 25 years incarceration in the Texas Department of Criminal Justice – Institutional Division. [C.R.: 305, 306, 307 - 308]. Appellant filed a motion and amended motion for new trial, which the trial court denied following several evidentiary hearings. [C.R.: 313 - 319, 347]. Appellant timely filed a notice of appeal. [C.R.: 320, 355].

## ISSUES PRESENTED

GROUND FOR RELIEF NUMBER ONE:

> THE TRIAL COURT PREJUDICIALLY ERRED BY DENYING APPELLANT'S SPECIAL REQUESTED INSTRUCTION ON THE LESSER-INCLUDED OFFENSE OF MANSLAUGHTER.

GROUND FOR RELIEF NUMBER TWO:

THE TRIAL COURT ERRED BY EXCLUDING A VIDEO RECORDING OF APPELLANT'S EMOTIONAL OUTBURST UPON LEARNING THAT THE DECEDENT WOULD DIE FROM HER INJURIES.

GROUND FOR RELIEF NUMBER THREE:

THE TRIAL COURT ERRED IN REFUSING APPELLANT TO ADMIT DEFENSE EXHIBIT 132 AT THE PUNISHMENT PHASE OF TRIAL IN ORDER TO DEMONSTRATE APPELLANT'S REMORSE.

GROUND FOR RELIEF NUMBER FOUR:

THE TRIAL COURT ERRED IN ADMITTING HEARSAY STATEMENTS BY PATRICIA AND DONALD RITCHERSON UNDER THE EXCITED UTTERANCE EXCEPTION WITHOUT A SUFFICIENT PREDICATE SHOWING THAT THE WITNESS WAS UNABLE TO REFLECT UPON HIS STATEMENT AT THE TIME IT WAS MADE

## STATEMENT OF FACTS

The instant case arouse from a confrontation outside of Republic Live, a night club in the downtown entertainment district of Austin, shortly after closing hours on December 4, 2011. The decedent, Fatima Barrie, received a stab wound to the chest and was transported to Brackenridge Hospital but ultimately died of her injuries on December 21, 2011. [25 R.R.: 216]. Appellant received a self-inflicted stab wound to her thigh and was taken by her friends to Seton South West Hospital where she was located by the police, interrogated, and subsequently arrested.

The accounts of the confrontation between Appellant and the decedent, Fatima Barrie, varied widely at trial.

Kelvin Jones went to a club, Republic Live along with some friends on

December 3 - 4, 2009. [22 R.R.: 11 - 14]. His fiancee, Jamie Hopkins, and her classmate Fatima Barrie also went to Republic Live, but separately from him. [22 R.R.: 11, 14, 15]. A verbal argument between his friend, Ronald Pace, and another individual, Chris Carson, occurred inside the club and continued outside after the club closed and emptied outside onto the sidewalk. [22 R.R.:14, 16 - 24, 57, 59].

Jones overheard a girl make a provocative comment and he decided to get the girls and leave before the situation escalated. [22 R.R.: 26, 68 - 69]. Jones picked up Jamie Hopkins and turned her around so they could make their way from the disputants. He did the same for Barrie who had been standing next to Hopkins. [22 R.R.: 26, 28, 29, 71 - 72]. Barrie had been swinging at a girl in a red dress when Hopkins grabbed and moved her. [22 R.R. 92 - 93, 95, 114]. The three started walking down the street, but after five or ten steps, Barrie collapsed to the sidewalk and Jones noticed she was bleeding. [22 R.R.: 25 - 29, 30 - 31, 71 - 72]. Jones had not seen when Barrie was stabbed. [22 R.R.: 18, 31]. Nor had he seen the girl who Barrie had attacked holding a knife during the confrontation. [22 R.R.: 95].

Jaime Hopkins, Barrie's friend testified that she and Barrie were leaving an end-of-the-semester celebration at Republic Live in the early morning on December 4 when they encountered a group of individuals arguing outside the club. [21 R.R.: 164 - 176]. Two girls approached Hopkins and Barrie; Hopkins felt threatened and started to walk away. [21 R.R.: 178 - 184]. As they walked away through the

crowd, someone pulled Hopkins' hair. [21 R.R.: 186 - 189 (195)]. Her fiancee, Kelvin Jones, who had attended the club with his own friends, appeared and moved her to the side to avoid the crowd. [21 R.R.: 189 - 192]. As Jones moved her aside, she observed Appellant behind her waiving a little knife in the air. [21 R.R.: 192 - 193, 219 - 220, 261]. Kelvin also picked up Barrie, moved her over, and the three started walking away through the crowd. [21 R.R.: 194]. They walked a few steps and Barrie stumbled and collapsed to the sidewalk. [21 R.R.: 196]. The paramedics arrived and tended to Barrie, transporting her to the hospital. [21 R.R.: 197]. Hopkins did not see Barrie get stabbed. She insisted that neither she nor Barrie had been aggressive toward the girls who had approached them. [21 R.R.: 204, 211, 230, 255, 262]. She did not see Barrie swing at or strike Appellant. [21 R.R.: 210, 231].

Oghenebrohien "Shermay" Uwahlogho, a photographer working that night at Republic Live, testified that after the club had closed, she noticed two groups of people outside arguing back and forth. [22 R.R.: 211, 216, 217 - 218]. At some point during the argument, she observed Appellant in the crowd, with a knife raised, but lower it after Ryan Moore restrained her and calmed her down. Appellant then disappeared from her sight. [22 R.R.: 218 - 220, 229, 239, 263, 266 - 267]. She then saw Appellant move around Moore and disappear from her sight [22 R.R.: 220, 259. She did not see a physical confrontation with Barrie nor did she witness

Appellant stab Barrie. [22 R.R.: 222, 242, 264]. While walking to her car, however, she saw Barrie, bloodied, and lying on the sidewalk. [22 R.R.: 218 - 220, 242, 267].

Stefne Henderson testified in Appellant's first trial, but was unavailable for the re-trial; her previous testimony was read to the jury. [23 R.R.: 7 - 8]. Henderson and a friend had attended an end-of-semester party at Republic Live and were waiting after the club closed to board a party bus parked outside in the street. [23 R.R.: 14, 18]. She noticed that Appellant was among a group of other individuals, including Chris Carson and Ryan Moore, who were arguing loudly along with another group of individuals. [23 R.R.: 20 - 25, 73, 75, 80]. Appellant started arguing with some women with the other group, moving from one woman to argue with Barrie. [23 R.R.: 85, 86, 89 - 90]. The two moved closer toward each other. [23 R.R.: 32]. Barrie stopped arguing, turned away, and started to walk off. [23 R.R.: 44]. As Barrie walked away, Appellant raised a knife into the air, and stabbed Barrie in the chest by reaching around or over Barrie's right shoulder. [23 R.R.: 47 - 48, 52, 94 - 95, 97 - 98, 100, 124 - 125, 135]. Barrie had not touched Appellant prior to being stabbed. [23 R.R.: 101, 121]. Barrie walked a few steps and then fell to the ground. [23 R.R.: 50, 101]. Henderson observed Ryan Moore grab Appellant's wrist and get her to drop the knife. Appellant then walked off through the crowd.

[23 R.R.: 50 - 51, 101 - 104]. Moore appeared to have injured his hand on the knife because he ripped his shirt and wrapped his hand. [23 R.R.: 52, 54, 115].

Ashley York testified in the previous trial, but was "unavailable" for the re-trial; her previous testimony was admitted in lieu of live testimony. York had been a close a friend of Appellant. [23 R.R.: 146 - 147]. Ashley and several friends had plans to go to Republic Live on the evening of December 3. [23 R.R.: 148]. Appellant had a date that evening and did not initially go to the club but was called over later in the evening after one of the group became intoxicated and was ejected from the club. [23 R.R.: 148 - 149, 152 - 153, 154]. Appellant waited outside the club until it closed and met up with York outside. [23 R.R.: 156 - 157, 239]. York observed that her friend Chris Carson was arguing with another group of people outside. [23 R.R.: 159, 294]. Some girls with the other group, including Barrie, joined the confrontation, and Appellant was drawn into the argument with Barrie. [23 R.R.: 161 - 164, 167, 223, 278, 294, 295]. As the argument progressed, York tried to restrain Appellant, but she pulled forward toward the other group of arguing girls. [23 R.R.: 168, 175, 178, 179, 228]. York noticed that Appellant had a knife in her hand. [23 R.R.: 176 - 177, 179, 191, 228, 303]. York began to walk away and observed Barrie abruptly lunge toward Appellant and struck her in the head with her cell phone. [23 R.R.: 164 - 166, 170, 184, 188 - 189, 224, 229, 240, 243,

251 - 252, 278, 282, 289]. York did not stay to watch the confrontation but walked to Appellant's car parked in a nearby lot. Appellant shortly caught up with her, displaying a blood on her hand, and revealing that she had a stab wound on her thigh. [23 R.R.: 192 - 194, 195 - 196, 199, 230, 282, 291]. She also had a knot on her forehead from being struck. [23 R.R.: 283, 290]. York did not see Appellant stab Barrie after Barrie struck her. [23 R.R.: 240].

Chris Carson, a friend of Ashley York's fiancee, Ryan Moore, went to Republic Live with Moore on December 3. [25 R.R. 227 - 229]. After closing, Carson got into an argument outside the club with another club-goer, Ronald Pace, with whom he had bad history. [25 R.R.: 233 - 240]. The confrontation grew tense and Carson anticipated a fight breaking out. [25 R..R.: 237, 240]. While arguing with Pace, Carson saw Barrie suddenly approach with her arm raised and holding an object which appeared to be a high heeled shoe, but cross his path and strike Appellant in the head. [25 R.R.: 241 - 242, 272 - 276]. After striking Appellant, Barrie appeared to slip on the ground, but recover and very quickly Barrie and Appellant "crash[ed] into each other." [25 R.R.: 243 - 244, 278, 280]. Barrie again had her arm raised, holding a high heeled shoe as she approached Appellant a second time. [25 R.R.: 280]. Carson did not see Appellant with a knife as she engaged Barrie – she was not waiving it over her head. [25 R.R.: 280]. After the

two crashed into each other, the crowd surged around the two, blocking Carson's view of the events. [25 R.R.: 244 - 245, 281]. Carson and Ryan Moore left, returning to Moore's home. [25 R.R.: 246, 289]. Moore did not take a knife from Appellant, nor had he been injured that evening. [25 R.R.: 247, 283, 286].

Britney Carson, Chris Carson's younger sister also went to Republic Live on December, separately from her brother. [26 R.R.: 299, 304, 306; 27 R.R.: 23]. She left the club at closing time and saw Appellant and Ashley York standing outside in the street. [26 R.R.: 308 - 309]. York was arguing with a group of girls while Appellant stood by. [26 R.R.: 309 - 310; 27 R.R.: 31]. Suddenly, several girls lunged toward York and Appellant. [26 R.R.: 311]. She saw Barrie, who was among the group, struck Appellant in the forehead with her cell phone. [26 R.R. 311 - 312; 27 R.R.: 45 - 46, 49 - 51]. Barrie lost her balance after striking Appellant, stumbled backward, and fell, but then regained her feet. [26 R.R.: 312 - 313; 27 R.R.: 53, 104]. After Barrie recovered her feet, Britney observed that Appellant had a knife in her right hand and a frightened expression on her face. [26 R.R.: 314; 27 R.R.: 55, 56, 59, 103]. Barrie threatened Appellant, and group of girls again moved toward Appellant and York. [26 R.R.: 314 - 315; 27 R.R.: 61 - 62, 63, 106]. Barrie still had her cell phone in her hand, raised as a weapon. [27 R.R.: 64]. After the crowd of people rushed together, Britney could no longer see

Appellant. [25 R.R.: 315; 27 R.R.: 65 - 66, 108]. She left to go search for brother in the crowd but was successful. [26 R.R.: 316; 27 R.R.: 68 - 69, 123]. As she walked back along the sidewalk, she saw Barrie sitting on the curb, attended by her friends. [26 R.R.: 317- 318; 27 R.R.: 70].

Ryan Moore, Ashley York's fiancee, testified as a State's rebuttal witness. He, Chris Carson and another friend went to Republic Live on December 3 - 4. [27 R.R.: 137, 146 - 147]. Carson had an argument with someone inside the club which continued outside after closing. [27 R.R.: 149 - 153, 157]. Barrie and her friend were standing with the individual with whom Carson was arguing; York and Appellant were standing around Carson and Moore. [27 R.R.: 153, 161]. Barrie and her friend joined the argument and started to confront York and Appellant. [27 R.R.: 161, 212 - 213]. During the confrontation, Barrie suddenly removed her shoes and lunged at Appellant, but her friend restrained her from completing the attack. [27 R.R.: 164, 166, 168, 200, 218]. Barrie lunged a second time, this time striking Appellant in the forehead with an object, either a shoe or a cell phone. [27 R.R.: 165, 170 - 171, 172, 173, 174 - 175, 201 - 202, 219, 245]. After being struck, Appellant swung back at Barrie. [27 R.R.: 173, 176, 219]. Moore characterized her response as reflexive or reactive to Barrie's assault. [27 R.R.: 224]. Moore grabbed Appellant after she swung at Barrie, discovering that she had been holding

a knife in her hand, and that Barrie had been stabbed. [27 R.R.: 176 - 177, 219, 221 - 222, 231, 233]. He forced the knife out of Appellant's hand, and he kicked it away after it dropped to the ground. [27 R.R.: 178, 180, 185, 222, 239]. Appellant appeared "shocked or confused" by what had just occurred, and then walked off in Ashley York's direction. [27 R.R.: 181 - 182, 222]. Moore was not injured when disarming Appellant and did not remove his shirt or wrap his hand. [27 R.R.: 185, 223].

Austin police located Appellant in Seton Southwest Hospital later that morning and questioned her. Appellant explained that she had been downtown when a fight erupted. She felt a pinch in her leg and discovered that she had been stabbed. [24 R.R.: 266 - 267, 268, 285; State's Exhibit 40A]. She was transported from the hospital to police headquarters downtown where she was interrogated by a homicide detective. [24 R.R.: 278 - 279; 25 R.R.: 221, 223]. Appellant told Nelson that she had been downtown near Republic Live when a fight broke out. During that raucous she was stabbed in the leg by an unknown person [25 R.R.: 224 - 228]. Appellant admitted during her interrogation that she had participated in a verbal altercation with another girl. [25 R.R.: 230 - 231, 242; State's Exhibit 79]. During the altercation, the girl came at her and struck her. [25 R.R.: 239, 249 - 250]. She was also stabbed, and heard someone alert the crowd about someone

having a knife.  [25 R.R.: 239 - 240].

Barrie was transported to Brackenridge Hospital for her injuries.  Dr. Charlie Ross, a thoracic surgeon in the Brackenridge emergency room, attended to her, treating her for  penetrating wound to the chest consistent with a stab wound.  [22 R.R.: 123, 125, 142].  Treated the decedent for a stabbing/penetrating wound to the chest. [22 R.R.: 125].   The wound had pierced Barrie's pulmonary artery, causing the pericardial sack to fill with blood, depriving her hear to blood.  [22 R.R.:  130, 148 - 149].   Dr. Ross performed an emergency thoractomy in anticipation of a thoracic  surgeon to repair the damage.   [22 R.R.: 130].  Barrie's medical records reflected that she had experienced anoxic damage from the blood loss - a lack of oxygen to her brain.  [22 R.R.: 126, 135 - 136, 140].   She was declared brain dead on December  21, 2011.   [22 R.R.  141]

Dr. Ross agreed that stabbing a person in the chest with a sharp object was an act which was clearly dangerous to human life.  [22 R.R.: 142 - 143].  The object used to inflict the injury was capable of causing death or serious bodily injury.  [22 R.R.: 143].

Dr. Stephen Dewan, a cardiothoracic surgeon on call at Brackenridge Hospital performed the reparative surgery to the injury to Barrie's pulmonary artery. [22 R.R.: 157, 160  162, 168, 170].    Dr. Dewan estimated the depth of the injury was

approximately 2 ½ inches deep. [22 R.R.: 173, 189]. It was a small entrance wound, 2 ½ centimeters to a 0.5 centimeter laceration of the pulmonary artery. [22 R.R.: 174 - 175, 178]. The injury was consistent with having been caused by knife. [22 R.R.: 175].

Questioned about the injury, Dr. Dewan admitted that the stab was not the ideal manner for a person intending to stab another in the pulmonary artery. The optimal position would have been for the recipient to be lying down, rather than standing up. [22 R.R.: 187]. Dewan would want the recipient to be stationary rather than moving. [22 R.R.: 187 - 188]. It would have been optimal to stab a person in a lighted environment, not in the dark. [2 RR.: 189]. And, if the goal were to hit the pulmonary artery with one stab, then it would be more probable if the recipient of the stab were not wearing clothes. [22 R.R.: 190].

The forensic pathologist, Travis County Deputy Medical Examiner Vikie Willoughby conducted the autopsy and concluded Barrie had died after receiving "sharp force injury" – a stab wound to the chest. [24 R.R.: 208, 219]. The stab wound was received to her proximal pulmonary artery which caused blood loss to the brain. [24 R.R.: 209, 214, 225]. The injury went from less than 2 centimeters down to 0.5 centimeters. [24 R.R.: 208, 231]. Dr. Willoughby could not determine the size of the knife used to inflict the injury due to the elasticity of the

human body. [24 R.R.: 230, 233]. She agreed that the act of stabbing a person in the chest with a sharp object was "an act that's clearly dangerous to human life." [24 R.R.: 219, 220 - 221]. She could not conclude, however, whether the homicide was intentional. [24 R.R.: 221].

The knife used to inflict the injury was not recovered and accounts of its size also varied. [21 R.R.: 96]. One witness, Shermay Uwahlogho described the knife as having a 4 inch blade. [22 R.R. 200, 202, 204]. Jamie Hopkins testified the knife had a 2 ½ inch blade. [21 R.R.: 232]. Stefne Henderson described the knife has "huge" and having a 6 inch blade [23 R.R.: 96, 125 - 126]. Britney Carson characterized the knife as a "small knife" with about a 2 ½ inch blade. [27 R.R. 99, 106]. Ryan Moore characterized the knife has a "little knife," possibly 4 ½ to 5 inches from handle to blade tip. [27 R.R.: 178 - 179, 228].

DNA testing reflected that the Barrie's DNA was detected in samples obtained from Appellant's right shoe, pants, and jacket [25 R.R.: 151 - 152, 155, 160 - 161, 162 - 163, 184].

## SUMMARY OF THE ARGUMENT

1.     The trial court erred in denying Appellant's requested instruction on the lesser-included offense of manslaughter in the jury charge. As a matter of law, manslaughter may be a lesser-included offense of murder under both Tex.Penal

Code § 19.02(b)(1), intentional murder, and § 19.02(b)(2), commission of an act clearly dangerous to human life. Under the specific facts of the present case, there was at least a scintilla of evidence to support the jury's conclusion that Appellant's having stabbed Fatima Barrie was a reckless acts, supporting the inclusion of the lesser charge. The court's omission of the requested instruction caused some harm because the evidence both strongly supported a finding of manslaughter, and Appellant specifically argued that the stabbing was a reckless act. The lack of an instruction caused some harm to the defense.

2. The trial court erred in excluding from the guilt-innocence phase a video of Appellant making exculpatory statements in a highly distraught state after having been provoked into emotional distress by the news of Barrie's impending death. The court excluded the recording on the basis that the emotional outburst did not constitute a "statement" because the officer who provoked the outburst left the room. This definition of a statement was incorrect as a matter of law. Further, the court erred in failing to find at the time of the video's admission that it was admissible as an excited utterance under Tex.R.Evid. 803(2). The omission of the video had a substantial and injurious effect upon the verdict, both by excluding highly probative exculpatory evidence of Appellant's culpable mental state, a well as depriving her of evidence which would have warranted a lesser-included charge

of manslaughter.

3. The trial court also erred in preventing Appellant from playing the video tape during the punishment phase of trial – although permitting a witness to describe Appellant's distraught state – under Tex.R.Evid. Rue 403. The video itself was the "best evidence" of Appellant's distress and could not be meaningfully or effectively conveyed through a witnesses' hearsay description of Appellant's statements and emotional state. The probative value of the evidence far outweighed any *unfair* prejudicial effect which might have prompted the video's exclusion as evidence. The omission of the video had a substantial and injurious effect upon the punishment verdict by excluding highly probative evidence of Appellants' remorse, a factor which the jury would have considered in assessing sentence.

4. The trial court erred in admitting under the excited utterance exception of the Hearsay Rule statements by Appellant's mother and brother relating to an unadjudicated extraneous act in which Appellant attempted to stab her brother during a family dispute. The record did not establish on its face that the declarants met the threshold required to admit evidence as an excited utterance. The admission of the hearsay statements had a substantial and injurious effect upon the punishment verdict by introducing, for its substantive merit, an extraneous offense, similar to the offense for which Appellant had been found guilty, and which reflected

she was habitually assaultive.

## <u>GROUNDS FOR REVIEW</u>

GROUND FOR REVIEW NUMBER ONE:

THE TRIAL COURT PREJUDICIALLY ERRED BY DENYING APPELLANT'S SPECIAL REQUESTED INSTRUCTION ON THE LESSER-INCLUDED OFFENSE OF MANSLAUGHTER.

A.     Facts on which claim relies

Appellant was charged with murder under two alternative theories, intentionally and knowingly having caused death, under § 19.02(b)(1) and committing an act clearly dangerous to human life under § 19.01(b)(2).   [C.R. 20 - 21].   During the charge conference, Appellant submitted a special requested instruction on the lesser-included offense of Manslaughter. [27 R.R.:  255 - 257]. The judge denied the instruction and the jury was authorized to either convict Appellant of the offense of murder, or to acquit her outright. [C.R.:  286 - 296].  The jury returned a verdict of guilty to murder, as alleged in the indictment  [C.R.: 295].

B.     Argument and Authorities

The trial court erred by denying Appellant's special requested instruction for an instruction on manslaughter.   A defendant is entitled to a jury charge on a lesser-included offense if two requirements are met:    first, the defendant must request an instruction on a lesser-included offense of the  charged offense which

constitutes a lesser-included offense under Tex.Code Crim.Pro. Art. 37.09, and second, there must be "some evidence" that, if the defendant is guilty, he is guilty only of the lesser-included offense. *Cavazos v. State*, 382 S.W.3d 377, 382 (Tex.Cr.App.2012); *and*, *Flores v. State*, 245 S.W.3d 432, 439 (Tex.Cr.App. 2008). To be entitled to a lesser-included offense instruction there must be some affirmative evidence which both raises the lesser-included, and rebuts or negates an element of the greater offense. *Cavazos*, 382 S.W.3d at 385. Evidence to support the inclusion of a lesser-included offense may come from any source and may be strong or weak, impeached or contradicted. *Bell v. State*, 693 S.W.2d 434, 442 (Tex.Cr.App.1985). "Anything more than a scintilla of evidence is sufficient to entitle a defendant to a lesser charge." *Bignall v. State*, 887 S.W.2d 21, 23 (Tex.Cr.App. 1994). The court does not consider the credibility of the evidence in support of a lesser-included offense. *Banda v. State*, 890 S.W.2d 42, 60 (Tex. Cr.App. 1994).

I.      Involuntary Manslaughter is a lesser-included offense of Murder under §§ 19.02(b)(1) and (b)(2).

Like murder, manslaughter is a result-oriented offense. *See Britain v. State*, 412 S.W.3d 518, 520 (Tex.Cr.App. 2013) (citing *Schroeder v. State*, 123 S.W.3d 398, 400-01 (Tex.Cr.App.2003)). But in distinction to murder, which requires the specific intent to cause death, involuntary manslaughter involves a culpable mental state of recklessness about whether death may result from the defendant's conduct:

To prove manslaughter, the evidence must prove that the defendant recklessly caused the death of an individual. A person acts recklessly . . . when he is aware of but consciously disregards a substantial and unjustifiable risk. . . . The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

*Britain*, 412 S.W.3d at 520 (footnotes and internal quotations omitted).

The Court of Criminal Appeals, as well as lower courts have recognized that manslaughter – recklessly causing the death of an individual is a lesser-included offense of murder under Art. 37.09. *Cavazos*, 382 S.W.3d at 386 (manslaughter can be a lesser-included offense to murder under § 19.02(b)(2) murder); *Thomas v. State*, 699 S.W.2d 845, 852 (Tex.Cr.App. 1985); *Brown v. State*, 296 S.W.3d 371, 384 (Tex. App.- Beaumont 2009); *andi, Chavarriga v. State,* 156 S.W.3d 642, 648 (Tex.App. - Tyler 2004).

In *Cavazos*, the Court of Appeals specifically addressed manslaughter as a lesser-included offense to murder under § 19.02(b)(2) – committing an act clearly dangerous to human life. The Court explained that manslaughter could be a lesser-included offense to § 19.02(b)(2) murder because the functional difference between a murder and manslaughter lay in the difference of the culpable mental state, intent versus recklessness, a difference which met the criteria for a lesser-included offense under Art. 37.09(3):

The differences here are the following: Murder as alleged in the indictment included the intent to cause serious bodily injury and the commission of an act clearly dangerous to human life (shooting with a firearm) whereas manslaughter includes recklessness, which is a conscious disregard of a substantial and unjustifiable risk regarding circumstances or results surrounding the conduct. The commission of an act clearly dangerous to human life, shooting with a firearm, is the circumstance surrounding the conduct, which would be the same under either murder or manslaughter. This leaves us with the only difference being intent versus recklessness.

We disagree with the court of appeals's contention that the murder charged in this case does not require a culpable mental state for causing another's death. . . . Here, the indictment specified that Appellant shot the victim with a deadly weapon, so it can be inferred that he had the intent to cause the victim's death. Although the only mens rea specified in Section 19.02(b)(2) is the intent to cause serious bodily injury and the statute does not add a culpable mental state to the conduct that caused the death, murder under Section 19.02(b)(2) is a "result" crime. . . . . And, because the definition of recklessness is disregarding a risk that circumstances exist or the result will occur, the reckless mens rea for man-slaughter applies to either the nature of the conduct or the result of the conduct.

We conclude that causing death while consciously disregarding a risk that death will occur differs from intending to cause serious bodily injury with a resulting death only in the respect that a less culpable mental state establishes its commission. See TEX.CODE CRIM. PROC. ANN. art. 37.09(3).

*Id.*, at 384 (footnote and citations omitted).

Accordingly, manslaughter is a lesser-included offense of murder alleged under both (b)(1) and (b)(2).

ii.    There was sufficient evidence at trial to support the submission of the

lesser-included instruction.

The evidence to support the submission of a lesser-included offense need only be more than a scintilla. *Bignall*, 887 S.W.2d at 23. Further, in evaluating evidence, as fact-finders, jurors are entitled to make reasonable inferences and interpretations from what they have heard. *Hooper v. State*, 214 S.W.3d 9, 13, 14 (Tex.Cr.App. 2007).

There was sufficient evidence before the trial court to meet the factual basis to submit a lesser-included offense instruction on manslaughter. The testimony which reflected Appellant's specific intent to kill was limited to Stefne Henderson, who claimed that Appellant rushed Barrie from behind, reached over her right shoulder, and stabbed her with a "huge" knife. [23 R.R.: 47 - 48, 52, 94 - 95, 96, 97 - 98, 100, 124 - 126, 135]. The autopsy refuted this account. Although Appellant was taller than Barrie, 23 R.R.: 33, 49, 125, there was no appreciable downward wound track. [24 R.R.: 211]. Moreover, the wound track went from left to right, 24 R.R.: 210, rather than the right to left track that one would expect from an attack over Barrie's right shoulder and across her chest. The jurors could have reasonably accepted the medical testimony over Henderson's account to reject her account of the stabbing.

Other medical testimony, that by Dr. Dewan, cast doubt upon whether the

injury, under the circumstances in which it was inflicted, was one which an individual would have specifically intended to target and strike the heart. The angle of attack was not optimal to reach the target, it was dark and the recipient of the stab was moving, as well as clothed. [22 R.R.: 187 - 190]. Jurors could have accepted the tenor of the questioning and responses to cast doubt on whether Appellant had intended to target Barrie's heart or inflict a fatal wound.

Further, while the medical experts agreed that the act of stabbing an individual in the chest was one which was clearly dangerous to human life, 22 R.R.: 142 - 143, 175; 24 R.R.: 219, 220 - 221, none of them ventured to stated that the act demonstrated the intent to kill. The pathologist specifically testified that she could not conclude that homicide had been intentional. [24 R.R.: 221]. Jurors could have concluded that while the act of stabbing an individual in the chest was dangerous, it did not conclusively prove the intent to kill as opposed to reckless behavior. Dr. Willoughby's concession that she could not conclude the homicide was "intentional" merely reinforced the open question of Appellant's culpable mental state.

Moreover, the varying accounts of the knife further militate toward the lesser-included charge by refuting an implication that Appellant had the specific intent to kill when she stabbed Barrie. While Henderson characterized the knife as having

a six -inch blade, 23 R.R. 96, 1125 - 126, other witnesses, Britney Carson and even Barrie's friend, Jamie Hopkins estimated the blade to have been approximately 2 ½ inches. [21 R.R.: 232; 27 R.R.: 99, 106]. Jurors could have reasonably concluded that an individual using a small pen knife, as opposed to a large carving knife, would not necessarily have specifically intended to kill another person, as opposed to merely intending to injure her.

Finally, yet most importantly, Ryan Moore's testimony supported a conclusion that Appellant lacked a specific intent when she struck Barrie in response to the previous assault. He characterized Appellant's response to Barrie as "reflexive" or "reactive." [27 R.R.: 224]. After striking Barrie, Appellant appeared "shocked or confused" by what had happened. [27 R.R.: 181 - 182, 222]. Jurors giving credence to Moore could have concluded Appellant lacked a specific intent, but in her striking out against Barrie with a knife in response to the assault, had disregarded the dangerousness of her actions.

The evidence before the trial court amounted to more than a scintilla to support the submission of the lesser-included charge of manslaughter. In light of *Cavazos*, the jurors could have regarded the facts before them as reflective of reckless disregard to the likelihood that death would result from striking Barrie with a knife. The trial court erred in denying the requested instruction.

iii. The denial of a lesser-included instruction on manslaughter resulted in "some harm" to the defenses and compels reversal.

The denial of a requested jury instruction is measured for "some harm." *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Cr.App. 1984); *Arline v. State*, 721 S.W.2d 348, 351 (Tex.Cr.App. 1986); *and*, *Otting v. State*, 8 S.W.3d 681, 688 (Tex.App. - Austin 1999). The harm must be actual, rather than theoretical. *Arline*, 721 S.W.2d at 351. But if the denial of the instruction had *any* prejudicial impact upon the defense, then a conviction must be reversed. *Arline*, 721 S.W.2d at 351; *and*, *Otting*, 8 S.W.3d at 688 ("Error properly preserved by an objection will require reversal as long as the error is not harmless. . . . This has been interpreted to mean any harm regardless of degree.") (Internal quotations omitted).

> If the absence of instructions on the lesser included offenses requested and to which the defendant is entitled, leaves the jury with the sole option either to convict the defendant of the charged offense or to acquit him, a finding of harm is essentially automatic because the jury was denied the opportunity to convict him of the lesser included offenses. This is true because the jury, believing the accused to have committed some crime but given the option only to convict him of the greater offense, may choose to convict him of the greater offense, rather than acquit altogether, even though it had a reasonable doubt he really committed the greater offense.

*Otting*, 8 S.W.3d at 689 (citing *Saunders v. State*, 913 S.W.2d 564, 571 (Tex.Cr.App. 1995)). *See also, Montgomery v. State*, 198 S.W.3d 67, 94 (Tex.App. - Ft. Worth 2006) (citing *Otting*).

Appellant was harmed by the trial court's denial of the lesser-included charge on manslaughter because it placed the jury into an untenable "either-or" position in deliberating over muddled facts relating to a homicide. The evidence as a whole reflected that Appellant caused Barrie's death, but did not clearly and unequivocally reflect it was murder under § 19.02. The length of the jury's deliberation – 9 ½ hours, 28 R.R.: 124 – belies any conclusion that the evidence was overwhelming. While the evidence reflected Appellant had caused Barrie's death, it was nevertheless equivocal as to her culpable mental state. The medical evidence did not prove it to have been an intentional homicide – at most, the experts could conclude that it had been a dangerous act to stab Barrie in the chest – and the testimony by Henderson, the only direct witness to the stabbing, was largely offset by the medical evidence. The jury was permitted only two options, however, convict for murder or outright acquittal. Appellant acknowledged this limitation to the jury – that if they believed Appellant had acted recklessly, and thus been guilty only of manslaughter, they would have to acquit her. [28 R.R.: 78]. In the absence of an option of manslaughter, Appellant's attempt to emphasize in closing argument that Appellant's conduct had been only been reckless, 28 R.R.: 78 - 79, was rendered ineffectual. The harm to Appellant was precisely that harm which this Court recognized in *Otting*, that the jury, "believing [Appellant] to have

committed some crime but given the option only to convict [her] of the greater offense, [would] choose to convict [her] of the greater offense, rather than acquit altogether, even though it had a reasonable doubt [she] really committed the greater offense." *Otting*, 8 S.W.3d at 689.

Accordingly, this Court should hold the trial court erred in denying Appellant an instruction on the lesser-included offense of manslaughter, and that the denial of this instruction caused actual harm to Appellant's case. Her conviction should be reversed and the case remanded to the trial court.

§ § §

GROUND FOR REVIEW NUMBER TWO:

> THE TRIAL COURT ERRED BY EXCLUDING A VIDEO RECORDING OF APPELLANT'S EMOTIONAL OUTBURST UPON LEARNING THAT THE DECEDENT WOULD DIE FROM HER INJURIES.

### A.    Facts in Support of Claim

During the guilt-innocence phase of trial, the State presented testimony by the lead Detective, Anthony Nelson about his interviews of Appellant following the Barrie's stabbing.   Nelson first met with Appellant in the morning hours of December 4 after she was brought to police headquarters from the hospital.   [25 R.R.: 222 - 224].  Nelson's interview of Appellant was recorded and the video was both published to the jury and admitted into evidence as State's Exhibit 79.   [25 R.R.:  235 - 237, 244 - 245, 247, 248, 249, 250, 252, 254].  Nelson also discussed Appellant's statements to him about the events of the evening.   [25 R.R.: 224 - 256].

Nelson again met with Appellant on December 6, after she voluntarily appeared at the police station.   [26 R.R.: 115].  During the interview,  Nelson informed Appellant that Barrie was expected to die from her injuries.  In response to this news, Appellant immediately lost her composure, "became emotional, [and] cried."   [26 R.R.:   115, 116].   Nelson left the room, but later permitted Appellant's mother to visit her. [Def Ex.  132].  The hidden cameras remained

activated in the room, however, and Appellant's conversation with her mother were recorded. [26 R.R.: 131 - 132].

Appellant sought to introduce the recordings of Appellant's reaction to news that Barrie would die, but the trial court sustained the State's hearsay objection. [26 R.R.: 119 - 128]. In a hearing outside the jury's presence, Nelson explained that he met with Appellant on October 4 and started reading her the *Miranda* warnings when she advised him that she had an attorney. [26 R.R.: 121 - 122]. He placed her under arrest and advised her that Barrie was going to die from her injuries. [26 R.R.: 122]. Appellant started to cry and Nelson left the room. [26 R.R.: 123]. Outside the interview room, he encountered Appellant's mother and decided to let her speak with Appellant in the interview room. [26 R.R.: 123]. Her returned after Appellants' mother knocked on the door and stated Appellant had wanted to speak with Barrie's mother. [26 R.R.: 123 - 124]. He did not resume questioning Appellant. [26 R.R. 124].

The court concluded Appellant's statements on the video were not excited utterances because they were not actually made to Detective Nelson:

> there's not any statement actually made to this witness other than her crying. . . .
>
> . . .
>
> . . . the rule basically says a statement relating to a startling event or

condition. . . . no statements that I know of were actually made to this witness other than seeing her start crying. So I'm going to sustain the State's objection.

[26 R.R.: 125].

The recording, Defense Exhibit 132 was admitted into the record in a bill of exception. [26 R.R.: 120, 127 - 128].

B.      Argument and Authorities

The trial court erred in excluding Defense Exhibit 132 on the basis that Appellant's excited utterances had not been to Detective Nelson.

A court's decision to admit or exclude evidence is reviewed for an abuse of discretion. *Montgomery v. State*, 810 S.W.2d 372, 390 (Tex.Cr.App. 1991); *and*, *Sandoval v. State*, 409 S.W.3d 259, 297 (Tex.App. - Austin 2013). A court's exercise of discretion will be sustained if it falls within the zone of reasonable disagreement. *Sandoval*, 409 S.W.3d at 297. A court necessarily abuses its discretion, however, if it bases its decision upon a misunderstanding of the law, or a misapprehension of the facts. *Moreno v. State*, 22 S.W.3d 482, 489 (Tex.Cr.App. 1999). *Compare*, *Tollett v. City of Kemah*, 285 F.3d 357, 363 (5th Cir. 2002) ("An abuse of discretion occurs where the 'ruling is based on an erroneous view of the law or on a clearly erroneous assessment of the evidence'."); *and*, *United States v. Clymore*, 245 F.3d 1195, 1198 (10th Cir. 2001) ("the district court abused its

discretion in relying on a mistake of fact on which to base [its ruling].").

The trial court excluded Defense Exhibit 132 on the ground that her comments had not been directed toward Detective Nelson: "no statements that I know of were actually made to this witness other than seeing her start crying. So I'm going to explain the State's objection." [26 R.R.: 125]. The court did not take issue with the contention that Appellant was emotionally distraught upon learning Barrie would die, and so Appellant takes the position that it is not necessary the brief the issue of whether Nelson's comments statements were sufficient to place Appellant "the stress of excitement caused by the event. . ." Tex.R.Evid. Rule 803(2). This predicate showing, that Appellant was under the stress of Nelson's statements regarding Barrie's condition and her own arrest appears to have been accepted by the court.

I.    The trial court conflated the issue of Appellant's statement under the Rules of Evidence with whether they were a statement for the purposes of a custodial interrogation.

The trial court's ruling is based on its misunderstanding of what constitutes a "statement" under the Rules of Evidence and conflating that with the concept of a "statement" for procedural admissibility rules under the Constitution and Code of Criminal Procedure. The hearsay rule defines a "statement" as any oral or written verbal expression, or non verbal conduct which substitutes for a verbal expression.

Tex.R.Evid 801(a). This definition differs from the "testimonial statement" or interrogation-related statements. *See generally*, *Crawford v. Washington*, 541 U.S. 36, 51 - 52 (2004) (discussing testimonial statements); *Miranda v. Arizona*, 384 U.S. 436 (1966) (addressing custodial statements); *and*, Tex.Code Crim.Pro. Art. 38.22. These concepts of a statement for hearsay purposes, and a "statement" for procedural purposes are distinct. "Statement" in the context of *Miranda* and custodial interrogations connotes a two-way exchange of information for law enforcement purposes. There is a speaker and there is a listener. A "statement" under the Rules of Evidence contains no such definitional limitation that it me made to any particular individual, or even to another individual. There is no requirement under the Hearsay Rule that a "statement" must result from a question. Private diary entries constitute "statements" under the hearsay rule. *See Turpin v. Kassulke*, 26 F.3d 1392, 1401 (6th Cir. 1994); *United States v. Treff*, 924 F.2d 975, 983 (10th Cir. 1991); *and*, *Walker v. Lockhart*, 763 F.2d 942, 951 (8th Cir. 1985). Assertions made by a person in her sleep and overheard by others may constitute "statements," although their admissibility is dubious *See* Annot., Admissibility of Evidence Concerning Words Spoken While Declarant Was Asleep or Unconscious, 14 A.L.R.4th 802, 804 (1982 & Supp. 1989). Appellant's own soliloquy plainly met the definition of a "statement" under the Hearsay Rule

regardless of whether it was directed to Detective Nelson, to another person, or merely expressing her thoughts aloud.

ii.     Appellant's comments in the interrogation room were made while still under the stress of learning that her conduct would result in Barrie's death.

Nelson testified that after confronting Appellant that Barrie was expected to die  and that Appellant would be arrested, Appellant started to cry and he left the room. [26 R.R.:    115 -  116, 122 - 123].    Defense Exhibit 132, the video itself, reflects Nelson downplayed the extent of Appellant's emotional response in the interrogation room: she is plainly overwrought, audibly wailing, and hyperventilating.  [Def Ex. 132].  Even after her mother entered the interrogation room, Appellant was visibly distraught while discussing the incident.

A hearsay statement under the excited utterance exception need not immediately follow from the incident but may arise at a later time if a sufficient triggering event prompts an overwhelming emotional response.  *McCarty v. State*, 257 S.W.3d 238, 240 (Tex.Cr.App. 2008);  *Apolinar v. State*,   155 S.W.3d 184 (Tex.Cr.App. 2005);  *and*,  *Zuliani v. State*, 97 S.W.3d 589, 596 (Tex. Cr. App. 2003).  "The startling event need not be the original offense but can be a subsequent event, so long as it is itself startling or shocking."  *Sandoval*, 409 S.W.3d at 285; *Edmondson v. State*, 399 S.W.3d 607, 614 (Tex.App. - Eastland 2013);  *and*,  *Hunt*

*v. State*, 904 S.W.2d 813, 815 (Tex.App. - Fort Worth 1995). The declarant's emotional state need not be continual as long as the triggering incident is sufficient to produce a sufficient emotional state to precluding the declarant's ability to reflect upon her statements. *McCarty*, 257 S.W.3d at 240. *See also, Zuliani*, 97 S.W.3d at 595 - 596. The controlling inquiry under is whether the declarant is capable of conscious reflection despite her emotional state or whether she is sufficiently *dominated* by her emotional reaction to the triggering incident as to preclude conscious reflection upon her statements. *Zuliani,* 97 S.W.3d at 596.

Appellant's statements occurred within minutes of Nelson arrested her and advised her that Barrie would die from her injuries. Her demeanor on video reflects the extent to which she was influenced by Nelson's statement. Even after Appellants' mother entered the interrogation room to comfort her, the video still reflects Appellant was still dominated by her arrest and the news of Barrie's impending death. All of Appellant's exculpatory statements occur within approximately one half hour of learning of the death.

Notably, the court reversed its' ruling at the conclusion of the punishment phase of trial, acknowledging that Appellant's statements in the interrogation room had been excited utterances:

> I do think that we should have her testify as to initial statements that
> the daughter made to her there. I do think they are excited utterances

as to her finding out that [Barrie's] going to die, that the victim is going to die. I do think that they are excited utterances. And the ones that she – the statements that she makes to her mom, I think are admissible on that subject.

[29 R.R.: 199].

This later ruling, through clearly supported by the facts, came several days late and more than a dollar short; by the time it recognized the admissibility of Appellant's statement as an excited utterance, its relevance to the guilt phase had passed. For this reason, the trial court erred in initially excluding Appellant's statements upon learning of Barrie's impending death. To the extent that the trial court excluded the evidence under the belief that Appellant's assertions did not constitute a "statement," it rested upon an incorrect evaluation of the law. And to the extent that the court believed the statement did not constitute an exited utterance, its explanation on the record plainly demonstrates it was incorrect.

iii. The exclusion of the video had a substantial and injurious effect on Appellant's case by depriving her of directly relevant evidence of her lack of specific intent to kill, or cause serious bodily injury to Barrie.

The erroneous exclusion of evidence is reviewed for whether the error had a substantial and injurious effect upon the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex.Cr.App. 1997); *and*, Tex.R.App.Pro. Rule 44.2(b). This review is not the equivalent to a mere inquiry into the sufficiency of the evidence. While the strength of the evidence is a consideration of whether the error had a

substantial and injurious effect on verdict, the strength of the evidence as a whole is not determinative. *Bagheri v. State*, 119 S.W.3d 755, 763 (Tex.Cr.App. 2003). Unless the court has a fair assurance that the error did not have a substantial and injurious effect upon the verdict, it must reverse the verdict. *Garcia v. State*, 126 S.W.3d 921, 927 (Tex.Cr. App. 2004); *and*, *Motilla v. State*, 78 S.W.3d 352, 355 (Tex.Cr.App. 2002). If the court has a doubt about whether the error might have influenced the verdict, then it must presume that the error had an effect. *See*, *Barshaw v. State*, 342 S.W.3d 91, 94 (Tex.Cr.App. 2011).

The exclusion of the video was highly damaging to Appellants defense because it deprived her of potentially probative exculpatory evidence, in essence, an anti-confession. The video of Appellant's emotional reaction upon learning of Barrie's impending death was relevant because it contained express exculpatory statements probative toward her intentions toward Barrie on the night of the confrontation. At several points, a distraught Appellant exclaimed that she had "not meant to do it," or have "meant" to have caused Barrie's death. [Def Ex. 132 (counter at 42:00, 46:54, and 54:54)]. These statements were relevant and probative toward her culpable mental state; had the jury believed by the jury, it could have concluded that he had lacked the requisite culpable mental state to commit murder. Her general distress from learning of Barrie's impending death,

expressed through her remorse could have been interpreted by the jury to negate the culpable mental state to kill or cause injuries that resulted in Barrie's death.[1] *See and compare, Darby v. State*, 145 S.W.3d 714, 721 (Tex. App. -Fort Worth 2004) (citing *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex.Cr.App. 1991) (holding that lack of remorse is evidence from which jury can infer intent). *See also*, *Barley v. State*, 01-12-01002-CR, slip op. at 13 (Tex.App.- Houston [1st Dist.] 10-29-2013) (not published) ("A jury may consider a defendant's attitude during his police interview . . . when assessing guilt. Further, an intention to commit murder reasonably can be inferred when a defendant is hostile and shows no empathy or remorse during his police interview."); *and*, *Soto v. State*, 13-10-013-CR, slip op. at 18 (Tex.App. - Corpus Christi 10-20-2011) (not published). This testimony carried a strong probative value to the issue of Appellant's culpable mental state on the night of the incident. Moreover, the credibility of her statements could only be enhanced by the fact that her statements were made without anyone being present, underscoring the truth of her statements.

Further, the exclusion of the evidence also deprived Appellant of a clear factual basis to support the submission of a lesser-included offense of manslaughter.

---

[1] An individual who had intended to cause death or serious bodily injury would arguably not have expressed remorse upon learning that the complainant was likely to die from the assault. Why would she if she had intended to cause the very injuries she had just learned had occurred ? By contrast, the remorse reaction entails the defendant had not intended, nor anticipated that the injury would have occurred in light of her conduct.

It is reasonably likely that had the evidence been admitted, it would have prompted the trial court to submit the requested instruction (or, in the alternative, to strengthen Appellant's point of error on appeal) to the jury, permitting Appellant to present a reasonable option to the jury.

The trial court's exclusion of Defense Exhibit 132 had a definite and substantial prejudicial effect upon the defense and compels reversal of Appellant's conviction.

§ § §

GROUND FOR REVIEW NUMBER THREE:

> THE TRIAL COURT ERRED IN REFUSING APPELLANT TO ADMIT
> DEFENSE EXHIBIT 132 AT THE PUNISHMENT PHASE OF TRIAL IN ORDER
> TO DEMONSTRATE APPELLANT'S REMORSE.

### A.    Facts in support of claim

Patricia Ritcherson, Appellant's mother testified during the defense's punishment case-in-chief as one of two witnesses.  [29 R.R.:   161 - 192, 201 - 206].   Ritcherson stated that her daughter voluntarily went to the police station on December 6 and was arrested.  [29 R.R.  175].  Ritcherson went down to the station and was permitted to meet with Appellant.  [29 R.R.: 181].  Appellant was "visibly upset" and was crying about wanting to see her [deceased] father.  [29 R.R.: 176]. In a bench conference, Appellant advised the court that she wanted to show Defense Exhibit 132 as evidence of her remorse. [29 R.R.: 178 - 179].  After considering the issue the court concluded that Appellant's statements to her mother *were* excited utterances, and permitted the defense to call Ritcherson to relate her daughter's statements to her. [29 R.R.: 200  - 201].

Appellant requested to "offer the video itself as best evidence of what actually occurred there between Ms. Ritcherson and her daughter, Kaitlyn."   [29 R.R.: 201].   The court denied the request "on Rule 403" grounds.  [29 R.R.: 201].[2]

---

[2]  While the court did not specify its precise basis for excluding the video, its comments during the bench conference reflect the court wanted to conclude the trial by 5:00 o'clock: "Also,  it's 20 till

Ritcherson subsequently testified that she was permitted to meet with her daughter after she had been arrested. [29 R.R.: 202]. Appellant was crying and said that she wanted to "meet her father." Appellant's father was deceased and Ritcherson interpreted her daughter's statements to mean that she wanted to die. [29 R.R.: 202]. Appellant also told her that she had been frightened the evening of the incident with Barrie and that she had not intended to harm Barrie. [29 R.R.: 203, 204].

B.    Argument and Authorities

The trial court erred by denying Appellant's request to publish Defense Exhibit 132 and limiting the evidence of Appellant's remorse to a hearsay recital through her mother, Patricia Ritcherson. The court abused its discretion under Rule 403 by excluding the video, which constituted the best, most probative evidence of Appellant's remorse, in favor of the second-hand recitation of Appellant's statements.

I.    The Trial Court's exclusion of the evidence under Texas Rule of Evidence Rule 403 was unreasonable because it thwarted the policy of admitting relevant and probative evidence while lacking any overwhelming justification set out by the Rule.

The Rules of Evidence carry the presumption that relevant evidence will be admissible. *Pawlak v. State*, 420 S.W.3d 807, 809 (Tex.Cr.App. 2013); *and*, *Jessop*

---

5:00 and we need to wrap this thing up." [29 R.R.: 200 - 201].

*v. State*, 368 S.W.3d 653, 684 (Tex.App.-Austin 2012). Under Rule 403, relevant evidence should be excluded only if the probative value is *substantially* outweighed by the danger of *unfair* prejudice or other listed considerations.[3] *Montgomery*, 810 S.W.2d at 387. "Unfair prejudice' refers to a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Jessop*, 368 S.W.3d at 684 (internal quotations omitted). Trial courts should favor the admission of in close cases. *Sanders v. State*, 422 S.W.3d 809, 815 (Tex.App.-Ft. Worth 2014). "It is only when there exists a *clear disparity* between the degree of prejudice produced by the offered evidence and its probative value that Rule 403 is applicable." *Jessop*, 368 S.W.3d at 684.

In reviewing whether to admit evidence under Rule 403 the court should consider, (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *Erazo v. State*, 144 S.W.3d 487, 489 (Tex. Cr. App. 2004); *Reese v. State*, 33 S.W.3d 238, 240-41 (Tex.Cr.App. 2000).

In the present case, the evidence was highly probative to show Appellant's

---

[3] These considerations are: evidence which confuses the issues, evidence which misleads the jury, evidence which causes undue delay in the course of trial, or evidence which is needlessly cumulative to other evidence which has been presented. Tex.R.Evid. Rule 403.

remorse over having caused Barrie's death.  As direct evidence of her reaction, it was direct evidence of her reaction and the sincerity of her beliefs.   The evidence did not post a threat of influencing the jury in an *irrational* manner.   The time necessary to present the evidence was minimal in context of the entire trial.  The portion of the video which depicted Appellant was approximately 40 minutes; of this, approximately 20 - 30 minutes constituted reflected her emotional outbursts.  Finally, Appellant had a high need for the video since the quality of her remorse could not be meaningfully or as probatively presented through another source.  While Appellant's mother could relate that her daughter had been emotional and made statements of remorse, her dry testimony could not fully convey Appellant's statements in their full probative value.

In light of the foregoing, the factors in favor of publishing the portion of the video, Defense Exhibit 132 to the jury instead of limiting the defense evidence to Patricia Ritcherson's recitation of her daughter's statements substantially outweighs the Rule 403's listed considerations:

> a.     The video would not have unfairly prejudiced the State;

There was nothing in the video which would have *unfairly* prejudiced the State since the video merely captured Appellant's emotional reaction on hidden cameras in the police interrogation room after Detective Nelson advised her of

Barrie's anticipated death. The State in effect created the very evidence by prompting Appellant's emotional reaction and then recording that reaction. It could even be argued that Detective Nelson's decision to permit Patricia Ritcherson to visit her daughter was premised on his gambit that Appellant might make an inculpatory admission to her mother. Regardless of the reasoning for the State's recording Appellant's reaction, "unfair" prejudice in the context of Rule 403 refers only to the tendency of evidence to promote a decision on an *improper* basis. *Jessop*, 368 S.W.3d at 684. Insofar as the video objectively recorded Appellant's remorse for her actions, it was not *improper*.

b. The video would not have confused the issues;

The video would not have confused the issues for punishment because whether a defendant is remorseful for her conduct is an important consideration in assessing punishment. *See McMahon v. State*, 582 S.W.2d 786, 791 (Tex.Cr.App. 1978); *People v. Watts*, 165 P.3d 707, 713 (Colo.App. 2006); *People v. Vanhoesen*, 3 A.D.3d 787, 771 N.Y.S.2d 730 (N.Y. 3d Dept. 2004); *State v. Bauerly*, 520 N.W.2d 760, 762 (Minn.App. 1994); *State v. Constantine*, 588 A.2d 294, 296 (Me. 1991); *and, People v. Allen*, 158 Mich. App. 472, 478, 404 N.W.2d 266 (1987).

c. The video would not have mislead the jury;

The video was offered as probative evidence of Appellant's remorse. In response to the court's limitation of the evidence to Ritcherson's account of her daughter's reaction, Appellant plainly objected that the video itself was the "best evidence" available to prove the issue. [29 R.R.: 201]. The "best evidence" rule is premised on the basis of "produc[ing] the best obtainable evidence" for the jury's consideration. *Jurek v. Couch-Jurek,* 296 S.W.3d 864, 871 (Tex.App. - El Paso 2009). "[T]he exact words are "of more than average importance particularly in the case . . . where a slight variation of words may mean a great difference . . .." *Englund v. State*, 946 S.W.2d 64, 67 (Tex.Cr.App. 1997). "[I]f a party chooses to establish the content of a conversation by offering a recording, the best-evidence doctrine applies and Rule 1002 requires the introduction of the original recording . . ." Texas Rules of Evidence Handbook, 988 (2011). Publishing the video itself would have permitted the jury to evaluate Appellant's emotional reaction, rather then rely upon a limited and filtered recitation of that reaction by her mother. Rather than mislead the jury, depriving them of the video interfered with their role in evaluating "the sincerity of defendant's remorse" an issue "relevant to sentencing." *Allen*, 158 Mich. App. at 478. Ritcherson's testimony, rather than the video carried a capacity to mislead the jury because her recitation lacked the direct and immediate quality to making credibility determinations. The jurors would

have been no more mislead by actually viewing Appellant's emotional response than they were when viewing her responses during the December 4 interrogation.

   d.  The video would not have caused *undue* delay in the course of trial;

The court's comments during the bench conference, that it wanted to conclude the trial around 5 p.m. suggests that this was the primary factor underlying the court's decision to limit the presentation of evidence. [29 R.R.: 200 - 201]. Concededly, the court has a valid interest in managing its docket. But that consideration is not paramount, and must be evaluated in the context, not in absolutes.

Appellant was convicted of a first degree felony. She was facing a sentencing range of 5 years to life imprisonment. Trial on the merits had lasted nine days. The State presented twenty-nine witnesses; Appellant presented four. The punishment phase lasted one day. The State presented four witnesses; Appellant presented two. The time in which Appellant appeared on video was approximately 40 minutes but the time period in which Appellant made the relevant excited outburst was between 20 - 30 minutes. By limiting Appellant's presentation of probative evidence, the court injected a significant inequity of time between the State and defense's punishment phase presentations. The State presented four witnesses throughout the day to prove a single uncharted extraneous offense

involving Appellant and her brother.  Appellant, by contrast, presented only two witnesses, her mother, and her pastor, the latter whose testimony was relatively brief.  The court's limitation of Appellant's punishment evidence in order to hasten the end of trial  does not appear to arise from Appellant having taken an inordinate amount of time in presenting his punishment case. The court's desire to complete the trial by 5 p.m.  by truncating the defense's presentation of  30 minutes worth of video was unreasonable under the equities involved in the case.

> e.  The video was not needlessly cumulative with other evidence which had been presented.

Publishing the video to the jury would not have been needlessly cumulative with other evidence of Appellant's remorse for the simple reason that the video was the only evidence relating to Appellant's remorse for having caused Barrie's death.

The factors prompting exclusion under Rule 403 do not substantially outweigh the probative evidence demonstrating Appellant's remorse over the offense.

> ii.  The exclusion of the video and limitation of remorse evidence prejudiced Appellant's punishment phase presentation and very likely affected the jury's verdict.

The erroneous exclusion of evidence is reviewed for whether the error had a substantial and injurious effect upon the jury's verdict.  *King*,  953 S.W.2d at 271*;* and Rule 44.2(b).  Unless the court has a fair assurance that the error had

either no influence, or only a minor effect on the verdict, then it must reverse the verdict. *Garcia*, 126 S.W.3d at 927; *and*, *Motilla*, 78 S.W.3d at 355. If the court is unsure whether the error might have influenced the verdict, then it must presume that the error had an prejudicial effect. *See*, *Barshaw*, 342 S.W.3d at 94.

The court's exclusion of the video in favor of Patricia Ritcherson's testimony had substantial effect on the jury by depriving the defense of the most probative evidence demonstrating her remorse. The full probative effect of the video is reflected in the well-worn saying "a picture is worth a thousand words." As noted previously, the video constituted the best evidence because it most accurately depicted Appellant's emotional state. The actual depiction possessed a quality that could not be matched by the mere description of her reaction; it is akin to the distinction between seeing a moving painting, say, for example, Géricault's *The Raft of the Medusa*, and reading a description of a painting. Both convey information – but they are not the same. Unlike directly viewing the video, jurors might reasonably have been skeptical of Ritcherson's testimony of her daughter's reaction. Jurors having viewed the video would not likely have harbored these doubts.

Moreover, in the context of evaluating harm, it is noteworthy that during closing argument at punishment, the prosecutor mocked Appellant's emotional

state throughout trial, contending that her tears in the courtroom had been motivated by self-pity, rather than remorse. [29 R.R.: 238]. The argument exploited the lack of directly probative evidence of remorse from the trial court's exclusion of the video. The court's exclusion of the evidence was not harmless, and warrants Appellant's case be remanded for a new sentencing trial.

§ § §

GROUND FOR REVIEW NUMBER FOUR:

> THE TRIAL COURT ERRED IN ADMITTING HEARSAY STATEMENTS BY PATRICIA AND DONALD RITCHERSON UNDER THE EXCITED UTTERANCE EXCEPTION WITHOUT A SUFFICIENT PREDICATE SHOWING THAT THE WITNESS WAS UNABLE TO REFLECT UPON HIS STATEMENT AT THE TIME IT WAS MADE.[4]

A.    Facts in support of claim

At the punishment phase of trial, the State sought to admit testimony of an unadjudicated extraneous offense in which Appellant had attempted to stab her brother, Donald Ritcherson during a family argument.

Officer Jared Jensen testified that he responded to a family disturbance call on May 15, 2009 where he encountered and spoke with Appellant, her mother, and her brother, Donald.   [29 R.R.: 60 - 63].  Over objection, Officer Jensen testified that Donald had informed him that he joined a family argument between Appellant and her mother.[5]    During the argument, Appellant "went to the kitchen and retrieved a steak knife and attempted to stab him with it."   [29 R.R.: 63, 65, 66]. Their mother intervened to keep Donald and Appellant separated and Donald managed to disarm Appellant. [29 R.R.: 66].   Patricia's account was "basically ..

---

[4]   Appellant brings the claim relating to statements by both Patricia and her son Donald in one claim because in the context of the evidence, the statements are intertwined and largely inseparable. Should the court conclude that the issues are multiplicitous, then Appellant would request the opportunity to re-brief the issue into two separate claims.

[5]   Appellant preserved error by timely objecting to the testimony and receiving a running objection.  [29 R.R.: 64].

. the same thing." [29 R.R.: 64, 66].

Appellant told Jensen that while she was arguing with her brother, he struck her in the face and pulled her hair, prompting her to get a knife and swing it at him in order to protect herself. [29 R.R.: 68, 71]. She displayed a mark by her eye, and Jensen noticed that her hair was "a little messed up." [29 R.R.: 67, 72 - 73].

Donald denied striking his sister, and contended the argument became physical after Appellant attempted to stab him. [29 R.R.: 68, 73]. Patricia Ritcherson advised Jensen that her son had not struck Appellant during their fight and that Appellant's injury had likely resulted from Patricia's efforts to keep her children separated. [29 R.R.: 68].

Patricia Ritcherson testified that there was family disturbance in the early morning hours on May 15 which escalated to pushing and shoving. [29 R.R.: 44 - 45, 51]. At some point the argument moved into the kitchen [29 R.R.: 52] While in the kitchen, Appellant picked up a knife, but Ritcherson did not remember Appellant swinging it. [29 R.R.: 46 – 47, 52]. Patricia managed to get between her children. [29 R.R.: 46].

Donald testified that he got involved into an argument between his mother and Appellant. [29 R.R.: 82]. The argument moved into the kitchen and at some point Appellant picked up a knife. [29 R.R.: 83]. Their mother got between them

and Donald took the knife from his sister.   [29 R.R.: 83].   Donald could not recall Appellant actually swinging the knife and he disarmed her after grabbing her hair. [29 R.R.: 88 - 89, 90 - 91].

B.      Argument and Authorities

The trial court erred in admitting Donald  Ritcherson's hearsay statements through Officer Jensen because the evidence before the court did not establish  that Ritcherson was sufficiently overwhelmed by his confrontation with Appellant  to have been incapable of reflection.

i.      The record lacked any factual basis to establish the predicate that Patricia and Donald Ritcherson were incapable of conscious reflection when relating the details of the confrontation with Appellant.

Although statements "relating to a startling event . . . made while the declarant was under the stress or excitement caused by the event" are admissible under Rule 803(2), the statement must be made under  circumstances in which the declarant has not had inadequate opportunity to consciously reflect upon the matter. *Apolinar*,  155 S.W.2d at 188 - 189; *and*,  *Zuliani*,  97 S.W.3d at 596 (Tex.Cr.App. 2003).  To be an excited utterance, the  "event speaks through the individual" rather than the individual simply relates the event. *Id*., at 595.  It is precisely the lack of opportunity to reflect prior to relating an event which is what renders the statements sufficiently reliable to be admissible as a hearsay exception.  *Volkswagen of*

*America, Inc. v. Ramirez*, 159 S.W.3d 897, 908 (Tex. 2005) (citing 6 Wigmore, Evidence in Trials at Common Law § 1747, at 195 (James H. Chadbourn rev. 1976)); *Glover v. State*, 102 S.W.3d 754, 763 (Tex.App. - Texarkana 2002); *Bounderant v. State*, 956 S.W.2d 762, 765 (Tex.App. – Fort Worth 1997). The court's focus then, as a predicate to admitting testimony under the exception, must rest on whether the declarant's emotional state is so overwhelmed by the incident that he is unable to have reflected in a meaningful manner upon his statement. *Apolinar*, 155 S.W.2d at 186. It is insufficient merely that declarant is in an "emotional" state, as opposed to a calm one. *Martinez v. State*, 178 S.W.3d 806, 814 - 815 (Tex. Cr. App. 2005); *and*, *Hughes v. State*, 128 S.W.3d 247, 252 (Tex.App. – Tyler 2003). "A statement that is simply a narrative of past acts or events is distinct from an excited utterance and does not qualify under Rule 803(2) regardless of how soon after the event it is made. . . . [The declarant] may have been upset, but that does not make [his] statements excited utterances." *Glover v. State*, 102 S.W.3d 754, 765 (Tex.App. - Texarkana 2002). The declarant must be sufficiently distraught by the incident to be incapable of reflection. *Salazar v. State*, 38 S.W.3d 141, 154 (Tex.Cr. App. 2001); *and*, *Lagunas v. State*, 187 S.W.3d 503, 512 (Tex.App. - Austin 2005). The burden of establishing that a witness's emotional state meets the criteria of an excited utterance rests with the proponent

of the evidence.   *Perez v. State*, 113 S.W.3d 819, 827 n. 4 (Tex.App. - Austin 2003).

The State did nothing to establish the predicate to admitting Donald Ritcherson's statements.   Officer Jarred Jensen  simply answered "yes" to the formulaic question whether Patricia and  Donald "appeared to be under  the influence of a recent startling event which was later described to you?"  [29 R.R.: 63].   This was inadequate to make the predicate showing under Rue 803(2).   The cases law behind Rule 803(2) requires more than this "magic words" or incantation approach.  Jarred's testimony, neither at the time of the courts ruling, or thereafter reflected that either Patricia or Donald were *dominated* by the previous argument, or rendered unable to reflect upon the incident before relating the details of their confrontation with Appellant.  It was insufficient merely to contend that Patricia and Donald were under some influence of the confrontation.   *Glover*, 102 S.W.3d at 765.

> ii.    The erroneous introduction of testimony that Appellant had attempted to stab her brother had a likely substantial and injurious effect on the jury's verdict.

The court must reverse the verdict unless it has a fair assurance from its review of the record that the error had either no influence, or only a minor effect on the verdict.  *Garcia*, 126 S.W.3d at  927; *and*,  *Motilla*, 78 S.W.3d at 355.  If the

court is unsure whether the error might have influenced the verdict, then it must presume that the error had an prejudicial effect. *See*, *Barshaw*, 342 S.W.3d at 94.

The 2009 incident in which Appellant allegedly tried to *stab* her brother likely had a highly prejudicial effect. Not only was it a crime of violence, but it mirrored the charged offense. This significance was not lost on the State; the both emphasized the incident during closing argument. [29 R.R.: 214 - 215, 220, 234 - 235]. Obviously, the probative thrust of the evidence lay in demonstrating that Appellant readily resorted to violence and that Barrie's killing had not been idiosyncratic.

While excluding as hearsay what Officer's Jensen's learned from Patricia and Donald might not have completely prevented the jury from hearing the evidence – their statements might have been admissible as prior inconsistent statements, Tex.R.Evid. Rule 613(a), this testimony would have been subject to an instruction limiting its probative value to mere impeachment. *See* Rule 105(a). Neither Patricia nor Donald claimed at trial that Appellant had swung the knife, much less attempted to stab her brother, and so the limited testimony about the knife would merely have contributed to a muddled and unclear incident. By contrast, in the present case, the evidence was admitted for its full probative value. The jury could consider the hearsay statements as direct evidence that Appellant had attempted to

stab her brother and disregard their lackluster testimony. Given the importance that the prosecution placed on the incident, there is little chance that the jury remained uninfluenced by the testimony. For this reason, the Court should reverse Appellant's sentence and remand the case for a new sentencing trial.

§ § §

**CONCLUSION AND PRAYER**

WHEREFORE, PREMISES CONSIDERED, Appellant respectfully prays this Honorable Court reverse Appellant's convictions, remand the case for re-trial, and to grant any other such relief to which Appellant may be entitled.

Respectfully submitted,

Law Office of Alexander L. Calhoun
4301 W. William Cannon Dr., B-150, # 260
Austin, TX 78749
Tele: 512/ 420- 8850
Fax: 512/ 233-5946
Cell: 512/731-3159
Email: alcalhoun@earthlink.net

BY:__/s/_*Alexander L. Calhoun*____
        Alexander L. Calhoun
        State Bar No.: 00787187

        Attorney for Appellant,

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Appellant's Brief has been served upon the Travis County District Attorney's Office, Blackwell-Thurman Justice Complex, Austin, TX 78767 on January 18 2015 by email to opposing counsel at the following email address: scott.talliaferro@co.travis.tx.us / scott.talliaferro@traviscountytx.gov.

/s/ *Alexander L. Calhoun*
Alexander L. Calhoun


## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document was created in 14 point type, Times New Roman font, and consists of 12464 words.

/s/ *Alexander L. Calhoun*
Alexander L. Calhoun