Rafael CAHVARRIGA, Appellant,

v.

The STATE of Texas, Appellee.

No. 12–03–00165–CR.

Court of Appeals of Texas, Tyler.

Dec. 30, 2004.

Douglas Scott Williams, for appellant.

Donna R. Bennett, for state.

Panel consisted of WORTHEN, C.J., GRIFFITH, J. and DeVASTO, J.

## *OPINION*

JAMES T. WORTHEN, Chief Justice.

A jury convicted Appellant Rafael Cahvarriga of murder and sentenced him to imprisonment for fifty-five years. In three issues, Appellant complains of the trial court's denial of his motion to suppress, its determination that a juror was disabled, and its failure to charge the jury on certain lesser included offenses. We affirm.

## BACKGROUND

On August 15, 2001, Appellant was indicted for the murder of his wife, Melissa Bonk. Appellant pleaded not guilty to the charge, and the matter proceeded to a jury trial.

The trial evidence showed that at 5:00 a.m. on April 23, 2001, twenty-two-year-old Appellant was in bed with sixteen-year-old Jennifer Nix in the master bedroom of Appellant's Mabank trailer house. According to Appellant's trial testimony, he and Jennifer were awakened by a noise outside the window of the trailer. Appellant looked out the window and saw Melissa's car. Melissa entered the trailer through a window. Appellant, dressed in boxer shorts, confronted Melissa in the bathroom just off the master bedroom. Melissa demanded to know who Jennifer was and began throwing things at her. Jennifer, who was nude, wrapped herself in a sheet and escaped into an adjoining room.

Jennifer testified that, from her vantage point, she could hear Appellant and Melissa shouting insults and abuse at each other. She could also hear Appellant and Melissa wrestling and being "very physical." As they wrestled, they moved into other parts of the trailer and ultimately returned to the master bedroom. Jennifer heard Melissa scream "You are killing me" and then heard her trying to get her breath. The sound stopped and she heard nothing further from Melissa. She testified that at this point she did not hear any noise from Appellant either. A few minutes later, she heard the shower come on. She said that Appellant came out of the master bedroom and told her that he had calmed Melissa down, but that he needed to take her (Jennifer) home. He went back into the master bedroom, retrieved Jennifer's clothes, and took her home.

Appellant testified that he had calmed Melissa down by putting her in the shower and turning cold water on her. He said that Melissa was in the bathtub taking a bath when he took Jennifer home. However, when he returned to the trailer, he found Melissa dead in the bathtub with a syringe stuck in her arm. Appellant stated that he panicked at this sight. He put weights on Melissa's body, wrapped it in a sheet, and put it in a trash can. He then dumped the trash can, with Melissa's weighted body inside, into the Trinity River. A fisherman in Freestone County found Melissa's partially decomposed body in the Trinity River fifteen days later on May 8.

After disposing of Melissa's body, Appellant filed a missing person report with Henderson County law enforcement authorities. Following a meeting with the investigating officers, Appellant hired an attorney. After Melissa's body was found, Appellant fled to Florida with Jennifer, traveling under the name of "Dustin Kennedy." On June 6, he was arrested by police in Hialeah, near Miami, on two outstanding felony warrants for drug possession and a weapons violation. He identified himself to the arresting officers as "Dustin Kennedy." After the arrest, Appellant gave an audio-taped statement to three Hialeah police officers describing the events leading up to Melissa's death. Appellant filed a motion to suppress the statement, which was denied. The statement was introduced into evidence at trial and conflicted with Appellant's trial testimony.

Jill Irvin, the medical examiner who performed the autopsy, testified that Melissa's body had been so badly decomposed after being in the water for fifteen days that she could not determine a specific cause of death.

The jury found Appellant guilty of murder and assessed his punishment at imprisonment for fifty-five years. Appellant timely filed this appeal.

### Sixth Amendment

In Appellant's first issue, he asserts that the trial court erred in denying his motion to suppress his audio-taped statement to the Hialeah, Florida police. In the statement, Appellant said that Jennifer had run into his room at 5:00 a.m. screaming that someone had broken into the trailer house. Appellant said he feared for his life and grabbed a .12 gauge shotgun. He pumped the gun, only to find that it was not loaded. He then used it to strike the intruder, who he later determined was his wife, Melissa.

Appellant points out that (1) at the time of his arrest, the Hialeah police knew he was a suspect in Melissa's death, (2) the officers knew before he gave the audio-taped statement that he was represented by an attorney in Texas in connection with Melissa's death, and (3) the officers knew Appellant's Texas attorney did not want them to talk to Appellant about Melissa's death. Therefore, Appellant argues, his Sixth Amendment right to counsel[1] precluded the officers from taking his statement without his counsel present to advise him.

### Standard of Review

■ We review a trial court's ruling on a motion to suppress for abuse of discretion. *See Villarreal v. State,* 935 S.W.2d 134, 138 (Tex.Crim.App.1996). In reviewing the trial court's ruling, we apply a bifurcated standard of review. *See Carmouche v. State,* 10 S.W.3d 323, 327 (Tex. Crim.App.2000). We give almost total deference to the trial court's determination of historical facts and review de novo a trial

court's application of the law to those facts. *Guzman v. State,* 955 S.W.2d 85, 89 (Tex. Crim.App.1997). In a suppression hearing, the trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *State v. Ross,* 32 S.W.3d 853, 855 (Tex.Crim.App.2000).

### Applicable Law and Analysis

■ The Sixth Amendment provides that in all criminal prosecutions the accused shall enjoy the right to assistance of counsel for his defense. U.S. Const. amend. VI; *McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991). However, this Sixth Amendment right is offense specific. *Id.* The Sixth Amendment right to counsel cannot be invoked against potential future prosecutions that have not commenced. *Id.* Moreover, the right to counsel does not attach until the initiation of adversary judicial proceedings (including formal charge, preliminary hearing, indictment, information or arraignment). *Texas v. Cobb,* 532 U.S. 162, 167–68, 121 S.Ct. 1335, 1340, 149 L.Ed.2d 321 (2001).

As authority for his contention that he was entitled under the Sixth Amendment to consult the counsel he had retained before his June 6 arrest, Appellant cites *Holloway v. State,* 780 S.W.2d 787 (Tex. Crim.App.1989). However, this case is distinguishable from the facts before us. In *Holloway,* the appellant was indicted for capital murder the day before he spoke to law enforcement. Consequently, his Sixth Amendment right to counsel had attached at the time he was interviewed by the officers. *Id.* at 793–94.

---

1. Appellant does not raise any Fifth Amendment issues on appeal. Therefore, our discussion is limited to the Sixth Amendment.

Here, Appellant was arrested on the outstanding felony warrants for drug possession and weapons violations. He was only a suspect in his wife's murder. An arrest for a charged offense does not trigger a person's Sixth Amendment right to counsel for an uncharged offense. *Upton v. State*, 853 S.W.2d 548, 555 (Tex. Crim.App.1993). Appellant's right to counsel did not attach on the charge in the instant case until adversary judicial proceedings were instituted. *See Holloway*, 780 S.W.2d at 795. This occurred when Appellant was indicted for Melissa's murder more than two months after he spoke to the Hialeah police. *Holloway* is therefore inapplicable to the facts before us.

Once the Sixth Amendment right to counsel has attached, the police may not interfere with the efforts of an attorney to act as a medium between his client and the State during an interrogation. *Id.* at 791 (citing *Moran v. Burbine*, 475 U.S. 412, 428, 106 S.Ct. 1135, 1144, 89 L.Ed.2d 410 (1986)). Prior to that time, a suspect who has been properly advised of his right to counsel under *Miranda* can waive the right. *See Holloway*, 780 S.W.2d at 790. This is true even where the suspect has counsel. *See Burbine*, 475 U.S. at 429, 106 S.Ct. at 1145. The trial court found that Appellant initiated the communication with the Hialeah police, was read his *Miranda* warnings, and still chose to give a statement about Melissa's death. The record supports these findings. The trial court correctly applied the law to the facts and determined that Appellant knowingly, intelligently, and voluntarily waived his right to counsel. Therefore, the trial court did not abuse its discretion in denying Appellant's motion to suppress the written statement he gave in Florida. Appellant's first issue is overruled.

## DISABLED JUROR

In his second issue, Appellant contends that the trial court erred in determining that juror Victoria Hamelin was disabled and in not granting Appellant's motion for mistrial instead of discharging Hamelin as a juror.

A juror is disabled only when the juror is physically, emotionally, or mentally impaired in some way that hinders the juror's ability to perform the duties of a juror. *Brooks v. State*, 990 S.W.2d 278, 286 (Tex.Crim.App.1999). Stated another way, a disability is not limited to physical disease, but also includes "any condition that inhibits a juror from fully and fairly performing the functions of a juror." *See Reyes v. State*, 30 S.W.3d 409, 411 (Tex.Crim.App.2000) (citing *Griffin v. State*, 486 S.W.2d 948, 951 (Tex.Crim.App.1972)). This condition may result from physical illness, mental condition, or emotional state. *Reyes*, 30 S.W.3d at 411; *Brooks*, 990 S.W.2d at 286. The determination as to whether a juror is disabled is within the discretion of the trial court. *Id.* Absent an abuse of that discretion, no reversible error will be found. *Id.*

The record before us shows that Hamelin had been impaneled along with the eleven other jurors on March 24, 2003 to hear Appellant's case. The next morning, before the jury began to consider any evidence in the trial, Hamelin appeared before the trial judge. She explained that she had not realized until she had gone home the night before that she knew about Melissa's murder. She further explained that she lived with her son, Scott, who was a close friend of Darla Harvey. Darla Harvey was Melissa's aunt. Hamelin also testified that Scott was a good friend of Darla Harvey's son, Bobby, and that they worked on cars together. She told the court that her son owned the house in

which they lived and that he allowed her to live there rent free.

The trial court found that Hamelin appeared to be in an agitated and nervous condition as she related these facts to the court. The court further stated its opinion that "she'll recollect more facts about this case during the trial and that will cause her further agitation." The court then dismissed Hamelin from the jury. Based upon our review of the record, we hold that the trial court did not abuse its discretion by determining that juror Hamelin was disabled as that term is used in Article 36.29 or by denying Appellant's motion for mistrial instead of dismissing her. Appellant's second issue is overruled.

### LESSER-INCLUDED OFFENSES

In his third issue, Appellant contends that the trial court erred in denying his request for a jury instruction on the lesser included offenses of manslaughter, criminally negligent homicide, and aggravated assault.

### Standard of Review

Both Appellant and the State agree that we must apply a two-pronged test to determine whether a charge on a lesser included offense should be given. See Mathis v. State, 67 S.W.3d 918, 925 (Tex.Crim.App.2002). First, the lesser included offense must be included within the proof necessary to establish the offense charged. Rousseau v. State, 855 S.W.2d 666, 672 (Tex.Crim.App.1993). Second, some evidence must exist in the record that would permit a rational jury to acquit the defendant of the greater offense while convicting him of the lesser included offense. Moore v. State, 969 S.W.2d 4, 8 (Tex.Crim.App.1998).

### Applicable Law and Analysis

Manslaughter, criminally negligent homicide, and aggravated assault are lesser included offenses of murder. Cardenas v. State, 30 S.W.3d 384, 392 (Tex.Crim.App.2000). Therefore, the first prong of the test has been satisfied.

The State contends that the second prong of the test has not been satisfied because the evidence does not raise the issue of any of the three lesser included offenses. The State emphasizes Appellant's testimony that Melissa died in the bathtub from a self-induced drug overdose. A defendant's own testimony that he committed no offense or testimony that otherwise shows no other offense occurred at all is not adequate to raise the issue of a lesser included offense. Lofton v. State, 45 S.W.3d 649, 652 (Tex.Crim.App.2001). If a defendant either presents evidence that he committed no offense or presents no evidence, and there is no evidence showing that he is guilty only of a lesser included offense, then a charge on a lesser included offense is not required. Id. (citing Bignall v. State, 887 S.W.2d 21, 23 (Tex.Crim.App.1994)).

Appellant responds that this Court must consider his statement to the three Hialeah police officers that was introduced into evidence by the State. Specifically, he asks us to consider the following portion of his statement:

POLICEMAN: How long did the episode in the trailer—when your wife entered the trailer and you had the confrontation with her?

APPELLANT: I don't know. I don't know. It was—was—I wasn't thinking. All I was thinking was this person's gonna kill me, or I don't know. I need to defend myself because why would somebody want to come in at the house at 5:00 in the morning

if their—if their—the subject for them to be there is to kill me or, I mean, why would they be inside the house when all the cars are out there? That's the only thing that came to my mind. Somebody wants to kill me. I just went ballistic. I wasn't thinking. I—I got up. The first thing when I got up was, boom, the 12 gauge. I wasn't thinking, Who the hell is this? I was just thinking. This person's gonna kill me.

POLICEMAN: At one point was this person attacking you?

APPELLANT: Yeah. There was—yeah.

POLICEMAN: Which ended up being your wife?

APPELLANT: Yeah, it was.

POLICEMAN: Did you realize—did you know if it was a male or female while you were fighting with the individual?

APPELLANT: No, because it was dark. I just I just noticed long hair. I noticed long hair. I didn't notice it was male or female. I just noticed long hair.

POLICEMAN: How—how tall is your wife?

APPELLANT: I don't know.

POLICEMAN: Was she taller than you?

APPELLANT: A little bit, yeah.

POLICEMAN: She heavier than you?

APPELLANT: No.

POLICEMAN: Lighter than you?

APPELLANT: Yeah.

POLICEMAN: Were you expecting your wife?

APPELLANT: No. No. Every time—the night before I told her—I

asked her if she was gonna come home and she said no, she had to go to a friend's house. And I used to ask her this every time she was out. Please call me before you come to the house. And she always did. I told her, 'If you're gonna come to the house, call me after 10:00 in the morning. Let me know you're coming to the house.' 11:00, she called me. 'Hey, baby, I'm coming home. It is cool?' I'm like, 'Yeah, come on.' That night she—she—she never did anything like that. I mean, I told her, 'Hey, call me before you show up.' Okay. She never came to the house. If she didn't get ahold [sic] of me, she would not come to the house. She will not come to the house. I was always paranoid. I was always paranoid and—she knew, she wouldn't come to the house. And this morning I—I never thought she was gonna come home because she said, 'I'm going to a friend's house and I'm going to stay over there. I'll probably stay over there 'till the day I go to Iowa' or Ohio or whatever the hell. I don't know. I don't even know where she was going. Ohio.

POLICEMAN: Has anybody ever come into your house and either attempted to kill you or rob you or—shoot you?

APPELLANT: The phone calls. I've been shot a couple of times.

Calls, 'I'm gonna kill you.' I told this to my probation officer. Somebody's threatening me.

▆ Appellant concedes that he disavowed this entire statement in front of the jury. He reiterated to the jury that he had done nothing to cause Melissa's death. We must therefore determine whether Appellant's statement to the jury is evidence that would permit a jury rationally to find that if he was guilty, he was guilty only of manslaughter, criminally negligent homicide, or aggravated assault. *See Mathis*, 67 S.W.3d at 925.

Manslaughter requires proof that the defendant acted recklessly; that is, that he consciously disregarded a substantial risk of which he was aware. *See* TEX. PEN.CODE ANN. §§ 19.04(a), 6.03(c) (Vernon 2003). Criminally negligent homicide requires proof that the defendant acted with criminal negligence; that is, that he ought to have been aware of a substantial and unjustifiable risk that the result would occur. *See* TEX. PEN.CODE ANN. §§ 19.05(a), 6.03(d) (Vernon 2003). Aggravated assault requires proof that the defendant intentionally, knowingly, or recklessly caused serious bodily injury to another or used or exhibited a deadly weapon during the commission of the assault. *See* TEX. PEN.CODE ANN. §§ 22.01(a), 22.02(a) (Vernon 2003).

▆ In order to constitute a crime, the act or *actus reus* must be accompanied by a criminal mind or *mens rea*. *Cook v. State*, 884 S.W.2d 485, 487 (Tex.Crim.App. 1994). For an act to constitute any crime, there must first be a "vicious will." *Id.* (citing *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952)). In his statement to the Hialeah police, which was part of the evidence before the jury, Appellant did not admit to a bad act or a vicious will. Instead, he admitted that he was thinking only about his bodily safety. Therefore, by his own testimony, Appellant could not have been guilty of these lesser included offenses because he did not have the *mens rea* or vicious will necessary to commit these offenses. *See Godsey v. State*, 719 S.W.2d 578, 584 (Tex.Crim.App.1986). If believed by the jury, this evidence would require Appellant to be acquitted of any crime rather than found guilty of a lesser included offense of murder.

▆ For a defendant to be entitled to a lesser included offense instruction, the evidence must establish a lesser included offense as a valid rational alternative to the charged offense. *Wesbrook v. State*, 29 S.W.3d 103, 113 (Tex.Crim.App.2000). When the defendant merely denies commission of any offense and, therefore, presents no evidence establishing commission of a lesser included offense, he is not entitled to a charge on the lesser offense. *Fraga v. State*, 940 S.W.2d 736, 738 (Tex. App.-San Antonio 1997, pet. ref'd). We therefore hold that Appellant's disavowed statement to law enforcement denying a vicious will in the events leading up to the death of his wife is not evidence of manslaughter, criminally negligent homicide, or aggravated assault. As such, the trial court did not err in failing to submit the requested instruction. Appellant's third issue is overruled.

### DISPOSITION

Having overruled Appellant's three issues, the judgment of the trial court is *affirmed.*