**Affirmed and Opinion Filed February 1, 2022**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-20-00078-CR
## No. 05-20-00080-CR

**SHAQUINDA LASHAVA PERRY, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 363rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause Nos. F17-76188-W and F19-00686-W**

## MEMORANDUM OPINION

Before Justices Osborne, Reichek, and Smith
Opinion by Justice Osborne

A jury found appellant Shaquinda Lashava Perry guilty in cause number F17-76188-W of intentionally or knowingly by omission causing serious bodily injury to a child younger than 14 years of age, and guilty in cause number F19-00686-W of intentionally or knowingly causing serious bodily injury to a child younger than 14 years of age. The jury assessed punishment at 28 years' imprisonment in cause number F17-76188-W and 20 years' imprisonment in cause number F19-00686-W. In two issues, appellant contends the trial court erred by overruling her objections to expert testimony and to the jury charge. In a cross-issue,

the State requests that we reform the judgment to reflect the jury's deadly weapon finding in cause number F19-00686-W. We modify the judgment and affirm as modified.

## BACKGROUND

Appellant was indicted for injuring her son J.B., who was born in 2015. The amended indictment in cause number F17-76188-W ("the offense by omission") alleged that appellant "intentionally and knowingly by omission cause[d] serious bodily injury" to J.B. by "failing to seek immediate and adequate medical attention for [J.B.] after [J.B.] began to suffer seizures." The indictment in cause number F19-00686-W ("the offense by commission") alleged that on or about April 1, 2017, appellant "did unlawfully then and there intentionally and knowingly cause serious bodily injury to J.B., a child 14 years of age or younger, hereinafter called complainant, by striking complainant with defendant's hand and by striking complainant with and against an[ ] unknown object, the exact nature and description of which is unknown to the grand jury," and defendant "did use and exhibit a deadly weapon during the commission of the offense, to wit: Defendant's hand and an unknown object." The cases were tried together before a jury.

The jury heard evidence that J.B. was born prematurely and spent the first months of his life in a neonatal intensive care unit. On his discharge from the hospital, J.B. lived with a foster family until June 2016, when he was returned to appellant. His foster mother, Brittany Nowakowski, testified that at the time of his

return to appellant, "he was reaching his milestones, he was catching up to his peers. We didn't have any concerns." Although not yet walking, he "was cruising along furniture" and had taken "one unsteady step." He was "very mobile." He interacted with other children, and was "just a typical 11-month-old baby boy." He knew the names of other children and the family's pets, could say the names of his favorite foods, and "had lots of words." Dr. Kathy Thompson, the pediatric nurse practitioner who provided J.B.'s medical care at the time, also testified that J.B. was meeting all of the milestones for his "ages and stages" and had no "eye issues" after a visit with an ophthalmologist.

Several months after his return to appellant's care, however, Nowakowski visited with him and described his appearance as "frail" and "sick." He was tugging on his ear and had sores in his throat. Nowakowski offered to take J.B. and appellant to see a doctor, but appellant refused, saying she would be able to take him to the doctor. The following day, appellant reported to Nowakowski that J.B. had strep throat, and had also been referred to a neurologist because he had been having seizures. On a Christmas Eve visit, Nowakowski noticed J.B. "didn't appear as though he had any vision." Appellant confirmed that J.B. was totally blind in his left eye and partially blind in his right eye due to seizures. Appellant also told Nowakowski that J.B. "would sleep for 22 out of 24 hours of the day." Appellant told Nowakowski that she was "just waiting to hear back" to get an appointment

scheduled with the neurologist. Shortly after, appellant stopped communicating with Nowakowski.

Several witnesses testified to events that occurred while J.B. was in appellant's care. S.L., ten years old at the time of trial, testified that her mother and appellant were good friends. They lived nearby, and she often played with appellant's other children at appellant's home. S.L. testified that on one of these visits, J.B. and appellant were asleep in a bedroom. J.B. "woke [appellant] up." S.L. was bringing a bottle for J.B. when she observed appellant "punching" and "hitting" J.B. "in his face and on his legs," using her fist. Then appellant "threw him to the wall" but "she didn't . . . catch him. He just fell to the floor." After that, appellant "threw [J.B.] in the bathtub" "like a baseball." He hit the wall "where the soap goes." J.B. was crying and "he looked like he was scared." S.L. saw blood, "felt scared," and ran away. S.L. testified that she was seven at the time.

On April 20, 2017, Latoya Jasmine Lacaze, the sister of appellant's friend Roshell Lacaze, was babysitting at appellant's home while appellant was at work. Jasmine went to check on J.B. and found him with blood on his face and a soaked diaper. Concerned that J.B. "[j]ust laid there," she took a picture of him and sent it to Roshell, asking what to do. Roshell immediately called 911. Paramedics arrived and transported J.B. to Children's Medical Center.

Dr. Kristen Reeder examined J.B. at Children's Medical Center. Dr. Reeder is a medical doctor who is board certified in both general pediatrics and child abuse

pediatrics. She is the Assistant Professor of Pediatrics at the University of Texas Southwestern Medical Center and also practices at the REACH ("Referral and Evaluation of At Risk Children") Clinic at Children's Medical Center. She requested evaluation by an ophthalmologist, ordered a brain MRI, and requested further testing "to check the integrity of [J.B.'s] bones and his blood."

Dr. Reeder determined that J.B. had a head injury, seven rib fractures, two arm fractures, bruising in his mouth, and severe diaper rash. He was blind. The nerve extending from his eye to his brain had atrophied, and the nerve affecting his sense of smell was sheared. He also had a scar near his eye and a long scar on his stomach. He could not walk or talk and "was not doing the things that a normal 20-month-old should be" although "he had been developing normally" up to his first birthday. Dr. Reeder testified that there was "healing present" at some of the fractures, "indicating that [they] happened at least two weeks prior." J.B.'s brain had irreversibly "atrophied or kind of shrunken" and there was fluid in his brain, indicating that he had a subdural hemorrhage. Dr. Reeder testified that a subdural hemorrhage is caused by "significant trauma" and is "very concerning for possible abuse" when there is no trauma such as a car accident reported to explain it. She also testified that atrophied brain tissue "does not re-grow."

Dr. Reeder talked with appellant about J.B.'s medical history. Appellant reported that J.B. started having seizures in October, and was lethargic. There was a period where J.B. slept for several days, and she had to wake him to feed him.

Appellant also said she was concerned about J.B.'s vision. Appellant said she had been referred to a neurologist but J.B. had not seen one because appellant had been given incorrect contact information. She explained that the scar on J.B.'s eye came from running into a coffee table and the scar on his stomach was self-inflicted. Dr. Reeder testified that the scar on J.B.'s eye was consistent with appellant's explanation but the scar on his stomach was not. Appellant did not give any medical history that would explain J.B.'s rib and arm fractures.

Based on the "the history that was provided and the imaging and medical workup," Dr. Reeder opined that a blunt force injury to J.B.'s head "would have occurred somewhere in October at the time when mom said that he had that acute onset of seizures and lethargy." She testified that treatment "in the days after the blunt force trauma" and the seizures could have prevented J.B. from going completely blind. She testified that a caregiver would notice outward symptoms such as those appellant described, including frequent seizures and a period where J.B. slept for several days.

J.B. was returned to Nowakowski's care in May 2017. Nowakowski testified that on his return,

> He didn't have any words. He didn't have any vision. He couldn't walk. He couldn't crawl. He had multiple rib fractures and a cast on his left arm where he had multiple fractures. He had a permanent traumatic brain injury. And he wasn't eating any solid foods. He wasn't eating much of anything. He was coming up on his second birthday, and we were having to re-teach him how to eat pureed baby food.

Appellant testified on her own behalf, denying that she had caused J.B.'s injuries. She offered the explanation that J.B.'s injuries could have been caused by rough play with other children.

The jury answered questions in two separate charges, one for the offense by commission and one for the offense by omission, and assessed punishment in two separate verdicts. The trial court rendered judgments on the jury's verdicts, and this appeal followed.

## DISCUSSION

### 1. Jury charge

In her first issue, appellant contends the trial court abused its discretion by denying her requested jury charge in cause number F19-00686-W, the offense by commission, on two lesser included offenses: (1) recklessly causing bodily injury to a child by commission, and (2) with criminal negligence, causing bodily injury to a child by commission. She contends this error was harmful.

At the charge conference, appellant's counsel requested "a lesser for the injury by commission, just a bodily injury versus serious bodily injury, since there were a number of injuries that were talked about throughout the testimony, and they did not denote a specific injury in that particular indictment." Counsel repeated that appellant was requesting the lesser included offense of "just bodily injury, not serious bodily injury" in the charge for the offense by commission, and further explained, "so the difference is with commission, I'm asking for also just the bodily

injury because that changes it. So we have a series of injuries that vary because of the mens rea, and then we have a series of injuries that vary because of the level of injury." Counsel argued, "[w]e heard of multiple injuries that were not serious," including "arm breaks . . . the scratches and the scrapes . . . [and] for that reason, if the jury were to determine, oh, yes, we think that she caused the scratch on the belly or she caused the scratch on the eye, then that would be bodily injury versus serious."

The trial court then instructed the State to include "bodily injury" as appellant requested. The State added a paragraph for intentionally or knowingly causing bodily injury, but did not add paragraphs for bodily injury caused recklessly or by criminal negligence. The following day, the State objected to this addition, arguing that "all of the injuries that we have proven throughout the course of the trial qualify as serious bodily injury. So we ask that particular lesser be removed." The trial court denied this request. Appellant made no further objections even though paragraphs addressing "bodily injury" by recklessness or criminal negligence had not been added. The State argues appellant failed to preserve her complaint because she did not object to the amended charge.

For a jury instruction on a lesser included offense to be warranted, a defendant must satisfy a two-pronged test. First, the purported lesser included offense must be included within the proof necessary to establish the offense charged in the indictment. *Davison v. State*, 495 S.W.3d 309, 311 (Tex. App.—Houston [14th Dist.] 2016, no pet.). This is a question of law. *Wortham v. State*, 412 S.W.3d 552,

–8–

554–55 (Tex. Crim. App. 2013). The State does not contest that the first prong has been satisfied.

Second, before an instruction on a lesser included offense is required, "[t]here must be some evidence directly germane to the lesser-included offense for the finder of fact to consider before an instruction on a lesser-included offense is warranted." *Id.* at 557 (internal quotation omitted). This evidence must be more than mere speculation and must consist of affirmative evidence that both raises the lesser included offense and rebuts or negates an element of the greater offense. *Id.* at 558. It is not enough that the evidence raises only a "theoretical possibility" that the lesser offense occurred. *See Segundo v. State*, 270 S.W.3d 79, 91 (Tex. Crim. App. 2008).

"Serious bodily injury" and "bodily injury" are defined in the penal code, and those definitions were included in the jury charge. "'Bodily injury' means physical pain, illness, or any impairment of physical condition." TEX. PENAL CODE § 1.07(a)(8). "'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46). At the charge conference, appellant contended that J.B.'s arm fractures and two scars were "bodily injury," not "serious bodily injury."

Assuming without deciding that (1) appellant preserved her complaint by her initial objection and (2) there was evidence to raise the lesser included offenses of bodily injury by recklessness or criminal negligence, we nonetheless conclude there

–9–

was no evidence rebutting or negating an element of the greater offense found by the jury, "intentionally or knowingly causing serious bodily injury," or any of the other greater offenses included in the charge. Appellant denied that she injured J.B. and offered no explanation for any of his unquestionably "serious bodily injuries"—including brain damage and blindness, both permanent—other than "rough play" with other children. A defendant's own testimony that she committed no offense or testimony that otherwise shows no other offense occurred at all is "not adequate to raise the issue of a lesser included offense." *Cahvarriga v. State*, 156 S.W.3d 642, 648 (Tex. App.—Tyler 2004, pet. ref'd). "If a defendant . . . presents evidence that [s]he committed no offense . . and there is no evidence showing that [s]he is guilty only of a lesser included offense, then a charge on a lesser included offense is not required." *Id.* (citing *Lofton v. State*, 45 S.W.3d 649, 652 (Tex. Crim. App. 2001)).

Without evidence to support a finding that if appellant was guilty, she was guilty only of causing bodily injury with recklessness or criminal negligence, no instruction on those lesser included offenses was required. *See Wortham*, 412 S.W.3d at 557–58; *Lofton*, 45 S.W.3d at 652. We decide appellant's first issue against her.

**2. Admission of evidence**

In her second issue, appellant argues the trial court erred and abused its discretion in overruling her objection to expert testimony from witness Kathy Thompson "without proper predicate," and this error was harmful. Appellant

contends that because Dr. Thompson was never asked the predicate questions to qualify her as an expert, "the jury had no basis to determine whether Thompson applied a valid scientific theory, properly using a proper technique."

Appellant's complaint arises from the following testimony:

Q. In your medical opinion, what is the appropriate response the first time a child suffers a seizure and a parent witnesses that seizure?

A. We call the emergency room and work——

[DEFENSE COUNSEL]: Objection, Your Honor. I'm really going to object at this point in time because I don't believe that the State has offered her as a—as an expert at this point in time.

THE COURT: Overruled.

Dr. Thompson then testified:

Q. What is your advice to a parent? If the parent calls and tells you, hey, my child—I just saw my child have a seizure, what are you going to tell them to do?

A. I'm going to have the parent bring the child in or go to the closest emergency room.

Q. Okay. Right then?

A. Right then.

Appellant further argues the error in admitting this testimony was harmful because "Thompson's 'expert' opinion that any parent witnessing a seizure in a small child should take him immediately to the emergency room was fundamental to the State's theory of culpability against Appellant in Cause No. F17-76188," the offense by omission. As appellant argues, the amended indictment alleged that she

–11–

"fail[ed] to seek immediate and adequate medical attention for complainant after complainant began to suffer seizures."

We review a trial court's admission or exclusion of evidence for abuse of discretion. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). The trial court abuses its discretion when it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably. *Id.* Even if the trial court erred by admitting the evidence, we will not reverse unless the error affected appellant's substantial rights. TEX. R. APP. P. 44.2(b); *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018) (erroneous admission of evidence is non-constitutional error, reversible only when there is "a substantial and injurious effect or influence in determin[ing] the jury's verdict").

The Texas Rules of Evidence set forth three separate conditions regarding admissibility of expert testimony. *Vela v. State*, 209 S.W.3d 128, 130–31 (Tex. Crim. App. 2006) (citing TEX. R. EVID. 104(a), 401, 402, and 702). These rules require the trial court to make three separate inquiries that must all be met before admitting expert testimony: "(1) the witness qualifies as an expert by reason of [her] knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case." *Id.* at 131. These conditions are commonly referred to as (1) qualification, (2) reliability, and (3) relevance. *Id.* Appellant's issue challenges Dr. Thompson's qualifications and

–12–

the reliability of her "'expert' opinion that any parent witnessing a seizure in a small child should take him immediately to the emergency room."

The mere fact that a witness possesses knowledge and skill not possessed by people generally does not in and of itself mean that such expertise will assist the trier of fact regarding the issue before the court. *Vela*, 209 S.W.3d at 131. A witness will not always qualify as an expert merely by virtue of a general background. *Id.* Accordingly, qualification is a two-step inquiry: (1) a witness must first have a sufficient background in a particular field, but (2) a trial judge must then determine whether that background goes to the very matter on which the witness is to give an opinion. *Id.* The focus, then, is on the fit between the subject matter at issue and the expert's familiarity therewith. *Id.* at 133. Just as the subject matter of an expert's testimony should be tailored to the facts of a case, the expert's background must be tailored to the specific area in which the expert desires to testify. *Id.*

Thompson is a pediatric nurse practitioner who carries the title of "doctor" because she received her doctorate of nursing practice in 2013. At the time of trial, she had been a pediatric nurse practitioner for twenty years. Dr. Thompson saw J.B. as a patient from the time J.B. was discharged from the neonatal ICU until he was returned to appellant's care in June 2016.

From 2015 to 2018, Dr. Thompson was the "sole provider" at a clinic associated with Children's Medical Center. Dr. Thompson explained that "sole provider" "means that you diagnose, you assess, you evaluate, you treat, you provide

patient education. We do all the immunizations, well child checks, sick visits. We do everything." If a child presented with an issue "beyond the scope of [the] clinic," Dr. Thompson could refer them to Children's Medical Center, where medical records could be accessed on a shared electronic system.

Dr. Thompson also testified about a typical visit with a sick child. After medical assistants evaluate the child's vital signs and determine the child's symptoms, Dr. Thompson then conducts "a thorough assessment," checking "everything from the abdomen up, depending on what the symptoms are." She then determines appropriate treatment, and, giving the example of a child with "a poor respiratory status or wheezing," may refer the patient to a hospital emergency room. She also testified that it was very important "to obtain a good history from the parent" and "to determine if that history matches the objective data that's based on diagnosis, previous encounters, things like that." An accurate initial history is very important "because it helps you determine if you need to refer that patient for more expansive testing or evaluation." If a child presents with a medical issue that does not match the history given, then she will consult with her collaborating physician, and may involve social services or make a referral to the emergency room.

Immediately before the testimony quoted above, Dr. Thompson was given the "hypothetical example" of a child whose medical history was given as having fifteen to twenty seizures in the past month, and "after one seizure, this child slept for a day and a half to two days and had to be woken up to be fed." Dr. Thompson testified

that after she did her initial assessment, "I'm going to be on the phone to the emergency room. I'm going to call 911 and get that child evaluated. I'm going to let the emergency room know that they need a neuro consult—neurology consult . . . ."

We conclude that the trial court did not err by overruling appellant's objection to Dr. Thompson's testimony. The State established that Dr. Thompson's education, training, and work experience qualified her to testify reliably about the appropriate response to a child's seizure. *See Vela*, 209 S.W.3d at 131.

We further conclude that any error in admitting this testimony did not affect appellant's substantial rights and accordingly, was not harmful. *See* TEX. R. APP. P. 44.2(b); *Gonzalez*, 544 S.W.3d at 373. The same opinion was rendered by numerous other witnesses who testified, including both lay and expert witnesses, without objection. Nurse practitioner Connie Nellum, who treated J.B. on several occasions and whose expert qualifications were unchallenged, testified:

> Q. Okay. I think we covered this, but if—if a parent sees a child have a seizure, what would you recommend them do right then?
>
> A. I recommend that they stabilize the head, get on the phone, dial 911 immediately.
>
> Q. Right then?
>
> A. Right then.

Similarly, Dr. Reeder testified without objection or challenge to her expert qualifications:

> Q. Okay. And when you say that [J.B.] acutely began having seizures, what does that mean?

–15–

A. Meaning that [appellant] noted that one day [J.B.] was having seizures. It wasn't something that he had been having that got worse or changed. It was abruptly he began to have seizures one day that were quite frequent initially.

Q. Okay. And I mean, as a citizen—just as a concerned person, if you see someone have a seizure for the first time, what is the reasonable person going to do?

A. It can be quite jarring to see someone have a seizure. I would feel that a reasonable person would try to call for medical help, whether it be 911 or someone nearby, someone that has medical training.

We conclude the trial court did not abuse its discretion in admitting the evidence, and in any event, appellant's substantial rights were not affected. *See Rhomer*, 569 S.W.3d at 669; *Gonzalez*, 544 S.W.3d at 373. We decide appellant's second issue against her.

## 3. Modification of judgment

In its cross-issue, the State requests that the judgment in cause number F19-00686-W be modified to reflect the jury's deadly weapon finding. Appellate courts may modify a trial court's judgment and affirm it as modified. *See* TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993). This Court "has the power to correct and reform the judgment of the court below to make the record speak the truth when it has the necessary data and information to do so." *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd). Appellate courts may reform trial court judgment where "the evidence necessary to correct the judgment appears in the record." *Id.*

The record in cause number F19-00686-W reflects that (1) the indictment alleged that appellant "did use and exhibit a deadly weapon during the commission of the offense, to wit: [appellant's] hand and an unknown object"; (2) the jury charge included the "special issue," "Do you unanimously find beyond a reasonable doubt that the defendant used or exhibited a deadly weapon, namely, a hand or an unknown object, during the commission of the offense?"; (3) the jury responded "Yes" to this special issue; and (4) the trial court's judgment reflects "N/A" in the blank under "Findings on Deadly Weapon." Because we have the necessary information to do so, we modify the judgment in the trial court's cause number F19-00686-W to reflect the jury's deadly weapon finding.

## CONCLUSION

We affirm the trial court's judgment in cause number F17-76188-W. We modify the trial court's judgment in cause number F19-00686-W and affirm the judgment as modified.

/Leslie Osborne//
LESLIE OSBORNE
JUSTICE

200078f.u05
200080f.u05
Do Not Publish
TEX. R. APP. P. 47.2(b)

–17–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

SHAQUINDA LASHAVA PERRY, Appellant

No. 05-20-00078-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 363rd Judicial District Court, Dallas County, Texas Trial Court Cause No. F17-76188-W. Opinion delivered by Justice Osborne. Justices Reichek and Smith participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 1st day of February, 2022.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

SHAQUINDA LASHAVA PERRY, Appellant

No. 05-20-00080-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 363rd Judicial District Court, Dallas County, Texas Trial Court Cause No. F19-00686-W. Opinion delivered by Justice Osborne. Justices Reichek and Smith participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** to reflect the jury's finding that appellant used or exhibited a deadly weapon in the commission of the offense.

As **REFORMED**, the judgment is **AFFIRMED**.

Judgment entered this 1st day of February, 2022.